IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: COVENANT PARTNERS, L.P.

GARY F. SEITZ,
*as Chapter 7 Trustee for the Estate of Debtor Covenant Partners, L.P.*,

            Plaintiff,

      v.

WILLIAM B. FRETZ, et al.,

            Defendants.

CIVIL ACTION
NO. 17-0052

### TABLE OF CONTENTS

I.    INTRODUCTION AND BACKGROUND ........................................................... 1

II.   FINDINGS OF FACT ...................................................................................... 6

   A.   Covenant Partners, L.P. ........................................................................ 6

      1.   Covenant's Founding and Structure ............................................. 6

      2.   Covenant Acquires Shares of Pet360 ......................................... 8

   B.   Covenant's Limited Partnership Agreement (LPA) ........................... 10

      1.   The General Partner's Investment and Management Authority, Including
to Borrow in Covenant's Name and to Secure Such Borrowing
with Covenant's Property ....................................................... 10

      2.   The General Partner's and Defendants' Authority to Self-Deal
and Have Conflicts of Interest ................................................ 12

      3.   The General Partner's Entitlement to a Management Fee and
a Performance Fee .................................................................. 14

   C.   From 2008 to 2010, Covenant Makes Loans to Keystone .............. 18

   D.   Frorer Partners Makes Three Loans to Fretz, Freeman, and Covenant ........... 20

      1.   Frorer Partners Makes Three Loans to Fretz, Freeman, and Covenant,
Each Secured with a Pledge of Pet360 Common Stock .................. 21

2. The Pet360 Common Shares Had No Known Value When They Were Pledged as Collateral for the Frorer Partners Loans ............................. 22

3. Covenant and Defendants Default on the Frorer Partners Loans, and Frorer Partners Demands Better Collateral for the Covenant Loan ........................ 23

   a. In March 2013, Title to 2,978,989 Pet360 Common Shares and in September 2013, Title to 2,000,000 Pet360 Common Shares Are Transferred into the Name of Frorer Partners ......................... 26

   b. At No Point Were the Frorer Partners Loans Consolidated but Instead Always Were Treated as Separate Loans ...................................... 27

E. Events Following the March and September 2013 Transfers of Title to the Pet360 Common Shares ........................................................... 29

F. Freeman Is Removed from the Pet360 Board, and Pet360 and PetSmart Discuss PetSmart's Potential Acquisition of All Pet360's Common Shares.................... 30

G. Frorer Purchases the Judgment from the Attorney General Lawsuit Through Tripartite, Causes a Writ of Execution to Be Issued, and Obtains Another 2,766,398 Common Shares of Pet360 Held by Covenant .................... 32

H. PetSmart Purchases All of the Common Shares of Pet360, and Pet360 Merges with PetSmart ....................................................................... 32

I. Covenant Files a Chapter 7 Bankruptcy Petition in an Attempt to Recover the Pet360 Common Shares that Had Been Transferred to Frorer................................... 33

III. CONCLUSIONS OF LAW................................................................. 36

A. Defendants' Motions in Limine ....................................................... 37

   1. Defendants' Motion in Limine to Preclude SEC Offer of Settlement Will Be Denied as Moot ............................................................... 37

   2. Defendants' Motion in Limine to Bar Evidence from the SEC's Investigation Will Be Granted........................................................... 38

   3. Defendants' Motion in Limine to Exclude the Hearsay Statements of Frorer Will Be Denied................................................................ 39

B. The Trustee's Claims for Breach of Fiduciary Duty Based on the Loan Advances to Keystone and the Performance Fees Are Barred by the Statute of Limitations............................................................... 40

   1. Pennsylvania's Two-Year Statute of Limitations Applies ............................... 40

   2. Equitable Tolling by the Discovery Rule or Fraudulent Concealment ........................ 42

ii

3. The Trustee's Claim for Breach of Fiduciary Duty Based on
the Loan Advancements Made to Keystone Is Time-Barred ........................................... 44

4. The Trustee's Claim for Breach of Fiduciary Duty Based
on the Performance Fees Is Time-Barred............................................................................ 46

C. Defendants Owed a Duty of Care to Covenant But Did Not
Owe a Duty of Loyalty and Only Owed the Duty Described in
Sections 7 and 8 of the LPA................................................................................................ 47

D. Defendants Did Not Breach Their Duty of Care or the Contractual
Provisions of the LPA by Pledging or Retitling Covenant's Pet360
Common Shares as Collateral for the Covenant Loan...................................................... 53

E. The Evidence at Trial Did Not Prove that Defendants Obligated Covenant
for their Own Personal Debts and thus Defendants Did Not Breach Their
Duty of Care or the Contractual Provisions of the LPA .................................................. 59

F. The Evidence at Trial Did Not Prove that Defendants Failed to Properly
Account for Various Assets of Covenant in Breach of Their Duty of Care ...................... 59

G. Damages................................................................................................................................ 61

IV. CONCLUSION............................................................................................................................. 61

<u>OPINION</u>

**Slomsky, J.**                                                                 **September 13, 2018**

## I.      INTRODUCTION AND BACKGROUND

This dispute begins with Covenant Partners, L.P. ("Covenant"), a Delaware limited partnership investment fund founded and run by Defendants William B. Fretz, Jr. and John P. Freeman.  Defendants founded Covenant in 1996 to invest the money of friends, family, and others close to them in privately-held startup and growth-stage companies.  From cradle to grave, Defendants exercised complete control over Covenant, making all decisions regarding its business affairs, including the management, investment, disbursement, and use of its assets. Between 1999 and 2013, Covenant acquired nearly 8 million shares of a small, private online pet supply retailer called Pet Food Direct, later known as Pet360, Inc. ("Pet360").   The actions Defendants took (and failed to take) in managing Covenant, and particularly in managing the Pet360 shares Covenant had acquired, are the subject of this litigation.

After founding Covenant in 1996, Defendants started Keystone Equities Group, L.P. ("Keystone") in 2003 as a registered broker-dealer.[1]  Keystone was Covenant's broker-dealer and was registered with the Financial Industry Regulatory Authority ("FINRA").[2]   From 2008 to 2010, Keystone experienced significant financial difficulty, much like the rest of the financial industry.  Between April 28, 2008 and June 1, 2010, Covenant made loans to Keystone totaling $1,203,058.   Ultimately, Keystone became the subject of a FINRA investigation, eventually

---

[1]    A broker-dealer "is in the business of buying and selling securities—stocks, bonds, mutual funds, and certain other investment products—on behalf of its customer (as broker) for its own bank (dealer), or both." (Ex. D-24 at 2.)

[2]    FINRA is a non-governmental entity that regulates broker-dealers.  <u>About FINRA</u>, FINRA, http://www.finra.org/about (last visited Aug. 16, 2018).

ceased doing business, and never repaid the principal or interest on the loans Covenant made to it.

Covenant's business and affairs were governed by a Limited Partnership Agreement ("LPA"). Under the LPA, Defendants were permitted to, among other things, borrow money on behalf of Covenant and secure loans with a pledge of Covenant's assets. They also were permitted to self-deal and have conflicts of interest. Finally, under the LPA, Defendants were entitled to receive a Performance Fee each year if certain conditions were met. The Performance Fee constituted 20% of the excess profits of Covenant for that year. In 2009 and 2010, Performance Fees were paid to Defendants even though Covenant had losses from prior years that had not been recouped.

In 2009, the Attorney General of Pennsylvania filed a lawsuit against Defendants, Covenant, and others in the Commonwealth Court of Pennsylvania, alleging wrongdoing related to a $2.5 million investment that Covenant had accepted in 2002 from a nonprofit entity known as Citizens Alliance for Better Neighborhoods ("Citizens"). As a result, in 2011, having incurred legal bills during this litigation, Defendants approached Peter Frorer, a business associate, to borrow money. Frorer agreed to lend Defendants money and, through his company, Frorer Partners, L.P., he made three loans: (1) a $450,000 personal loan to Fretz; (2) a $50,000 personal loan to Freeman; and (3) a $300,000 loan to Covenant, each with a maturity date of November 30, 2011. Although the loans may have been funded on different dates, each loan was secured by a separate pledge of Pet360 common shares, and executed on or about March 8, 2011. At that time each pledge of shares remained in the name of each borrower. The value of the Pet360 shares, however, was unknown.

In approximately August 2012, none of the loans had been repaid, and Frorer began demanding better collateral from Defendants and Covenant on the three loans due to concerns raised by Frorer Partners's auditors. Frorer wanted the shares retitled into the name of Frorer Partners. This request began an approximately yearlong battle between Defendants and Frorer and his auditors regarding retitling the shares. As a result of Frorer's continued demands to have Defendants retitle Covenant's Pet360 shares into the name of Frorer Partners, on March 26, 2013, a total of 2,978,989 shares were retitled, and on September 15, 2013, another 2,000,000 shares were retitled all into the name of Frorer Partners. Defendants and Frorer understood that when the loan was repaid, the shares would return to Covenant. At the time of both transfers, the value of the Pet360 shares remained variable and virtually unknown.

After the March and September 2013 retitlings, Frorer continued to demand more of Covenant's Pet360 common shares, but Defendants would not acquiesce. At the end of 2013, Frorer refused to return Covenant's Pet360 shares in exchange for other collateral. At this point, Frorer was the largest common shareholder of Pet360. On February 21, 2014, Frorer met with Brock M. Weatherup, Pet360's Chief Executive Officer ("CEO"), who informed him that Pet360 was receiving interest from various organizations about a potential acquisition. On June 11, 2014, Frorer sent an email to Defendants' attorney purporting to "foreclose" on the Pet360 shares that had been retitled in March and September 2013. Thereafter, on July 9, 2014, Frorer met with Weatherup, who informed him of PetSmart, Inc.'s ("PetSmart") intent to purchase all of Pet360's common stock for an expected price of slightly under $1 per common share.

In July 2014, Frorer entered into an Assignment Agreement with the Commonwealth of Pennsylvania under which he would purchase the $2.5 million judgment that had been entered against Covenant as a result of the Attorney General's lawsuit related to the investment from

Citizens. Frorer formed an entity called Tripartite, LLC ("Tripartite") for the purpose of acquiring this judgment and caused the Prothonotary of the Court of Common Pleas of Montgomery County, Pennsylvania ("Prothonotary") to issue a writ of execution on the judgment. The writ of execution resulted in a writ of attachment being directed to Pet360 as garnishee, requiring it to attach property in its possession belonging to Covenant, including any Pet360 shares, and to surrender to the custody of the Prothonotary its Pet360 common shares. On September 11, 2014, Covenant surrendered approximately 2.7 million Pet360 shares to the Prothonotary. On approximately September 29, 2014, Pet360 merged with PetSmart, and Covenant's 4,978,989 Pet360 shares that had been retitled to Frorer Partners were redeemed for cash consideration of $0.793 per share, totaling $3,948,338.28.

On September 19, 2014, Defendants caused Covenant to file a Chapter 7 petition for bankruptcy[3] in the United States Bankruptcy Court for the Eastern District of Pennsylvania ("Bankruptcy Court") for the purpose of recovering the transferred Pet360 shares. On September 22, 2014, Plaintiff Gary F. Seitz was appointed as the Chapter 7 Trustee ("Trustee").

On July 18, 2016, the Trustee filed this action as an adversary proceeding in the bankruptcy court against Defendants for breach of fiduciary duty owed to Covenant. Though the Complaint alleges a single count of breach of fiduciary duty, the Trustee advances five theories of how Defendants breached their duty. First, the Trustee alleges that Defendants caused Covenant to make unauthorized loan advancements to Keystone from 2008 to 2010. Second, he asserts that Defendants caused Covenant to issue unearned Performance Fees to themselves through its General Partner in 2009 and 2010. Third, the Trustee contends that Defendants

---

[3] Chapter 7 bankruptcy, also termed liquidation bankruptcy, allows a debtor to discharge all debts. Chapter 7, Black's Law Dictionary (10th ed. 2014). Chapter 7 of the United States Bankruptcy Code allows a trustee "to collect and liquidate all a debtor's nonexempt property, either voluntarily or by court order, to satisfy creditors." Id.

caused Covenant to improperly transfer its Pet360 common shares as collateral for Covenant's loan in March and September 2013. Fourth, he argues that Defendants obligated Covenant for their own personal debts to Frorer Partners. And fifth, the Trustee alleges that Defendants failed to maintain proper records and account for various assets of Covenant.

On March 31, 2017, Defendants moved to withdraw the bankruptcy reference of this adversary proceeding under 28 U.S.C. § 157(d), seeking a bench trial in this Court.[4] Although the Trustee initially opposed the Motion, he withdrew his opposition after the Bankruptcy Court denied the parties' cross-motions for summary judgment. In an Order dated September 7, 2017, this Court granted Defendants' Motion to Withdraw the Bankruptcy Reference as uncontested.

From January 22 to 25, 2018, a four-day bench trial was held before this Court. Thereafter, the parties submitted proposed findings of fact and conclusions of law. (Doc. Nos. 36, 37.) On May 18, 2018, closing arguments were held. Pursuant to Federal Rule of Civil

---

[4] Although federal district courts have original jurisdiction of all cases arising under the bankruptcy code and original but not exclusive jurisdiction of all civil proceedings arising under or related to cases arising under the bankruptcy code, 28 U.S.C. § 1334(a), (b), these cases are "referred to the bankruptcy judges for the district," 28 U.S.C. § 157(a). Under 28 U.S.C. § 157(d), however,

> [t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

Procedure 52(a),[5] the Court issues the following findings of fact and conclusions of law. Because the Trustee has not met his burden to prove by a preponderance of the evidence that Defendants breached their fiduciary duties to Covenant, judgment will be entered in favor of Defendants.

## II.     FINDINGS OF FACT[6]

### A.     Covenant Partners, L.P.

#### 1.     Covenant's Founding and Structure

In 1996, Defendants William B. Fretz, Jr. and John P. Freeman founded Covenant as a private Delaware limited partnership.  (Doc. No. 15 at 1.)[7]  Covenant's primary business was to invest in or loan money to privately-held startup and growth-stage companies.  (Fretz Tr. at 39:13-15, Jan. 22, 2018.)  Investments in Covenant took the form of limited partnership interests. (Fretz Tr. at 76:25-77:2, Jan. 23, 2018.)  Approximately 58 limited partners invested in Covenant, many of whom were family, friends, or business associates of Defendants.  (Doc. No. 15 at 2.)

---

[5]     Federal Rule of Civil Procedure 52(a) provides in relevant part as follows:

> ***(1) In General.*** In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a)(1).

[6]     The following findings are based on the evidence presented at the bench trial held on January 22 to 25, 2018 and facts to which the parties have stipulated.  At trial, the Court heard testimony from Defendants William B. Fretz, Jr. and John P. Freeman, Plaintiff Gary F. Seitz, and Mark S. Carrow, CPA.  The testimony of Brock M. Weatherup, former CEO of Pet360, Inc., was offered through his deposition and deposition exhibits.  All findings of fact are made by a preponderance of the evidence.

[7]     The parties filed stipulations in the Bankruptcy Court (Adversary No. 16-00226, Doc. No. 119) and included the stipulations in their respective Pretrial Memoranda filed in this Court (Doc. Nos. 14, 15).  For clarity throughout this Opinion, when referencing a stipulation of the parties, the Court will cite Plaintiff's Pretrial Memorandum (Doc. No. 15).

Fretz testified at trial, "Covenant was really a way for friends, family and people that we were close to to invest with us." (Fretz Tr. at 76:13-14, Jan. 23, 2018.) Covenant did not have any registration or reporting requirements with the Securities and Exchange Commission ("SEC") or FINRA. (Id. at 72:3-8, 90:21-91:1; Freeman Tr. at 30:5-10, Jan. 24, 2018.)

Covenant's general partner was Covenant Capital Management Partners, L.P. ("CCMP" or "General Partner"), and CCMP's general partner was Covenant Capital Management, Inc. ("CCMI"). (Doc. No. 15 at 1-2.) Defendants owned CCMI. (Ex. P-48.) CCMI owned 1% and Defendants each owned 49.5% of CCMP, the General Partner. (Doc. No. 15 at 2.)

On February 25, 2003, Defendants started Keystone, a registered broker-dealer that raised money for private companies and some public companies. (Ex. D-24; Fretz Tr. at 21:13-17, Jan. 22, 2018; at 74:21-22, Jan. 23, 2018.) As a broker-dealer, Keystone was registered with FINRA. (Fretz Tr. at 21:18-19, Jan. 22, 2018.) From the time it was formed, Keystone was Covenant's broker-dealer and was located in Oaks, Pennsylvania, where it shared office space with Covenant. (Doc. No. 15 at 2; Fretz Tr. at 79:8-14, Jan. 23, 2018.) As Covenant's broker-dealer, Keystone covered all of its expenses. (Fretz Tr. at 81:15-19, Jan. 23, 2018.) Defendants each owned up to 16% of Keystone. (Doc. No. 15 at 2.) Fretz was President and Freeman was Managing Director of Keystone. (Fretz Tr. at 20:17-21, Jan. 22, 2018; Freeman Tr. at 199:6-10, Jan. 23, 2018.)

From 1996 until Covenant's bankruptcy in September 2014, Defendants were the principals in charge of Covenant, making all decisions regarding its business affairs, including the management and investment, disbursement, and use of its assets. (Fretz Tr. at 18:25-19:9, Jan. 22, 2018.) Freeman was President and Fretz was Managing Director of Covenant. (Fretz Tr. at 119:22-120:6, Jan. 23, 2018; Freeman Tr. at 195:7-8, Jan. 23, 2018.) Defendants exercised

complete control over Covenant. (Freeman Tr. at 198:15-17, Jan. 23, 2018.) Fretz's role at Covenant was to bring in funds and communicate with investors. (Fretz Tr. at 78:20-23, Jan. 23, 2018.) Freeman's role at Covenant was to look for deals that were attractive to invest in, but he was not involved in the day-to-day operations. (Freeman Tr. at 25:17-25, Jan. 24, 2018.) Defendants never were paid a salary. (Fretz Tr. at 78:24-79:2, Jan. 23, 2018.)

From 1999 to 2012, Covenant's accountant was Mark S. Carrow, Certified Public Accountant ("CPA"). (Carrow Tr. at 55:8-21, Jan. 25, 2018.) From 1999 to 2009, Carrow was Covenant's accountant through his own firm, Carrow, Doyle & Associates, and from 2009 to 2012, he was Covenant's accountant through the accounting firm of Citrin Cooperman, LLP ("Citrin"). (Id. at 54:7-13, 55:15-25.)

### 2. Covenant Acquires Shares of Pet360

In 1999, Covenant began investing in Pet360, which was a private online retailer of pet food and supplies that had no publicly-traded stock. (Doc. No. 15 at 3; Fretz Tr. at 99:8-10, Jan. 23, 2018.) Pet360 had, however, three types of privately-traded stock: Series A Preferred, Series B Preferred, and common shares. (Freeman Tr. at 33:1-6, Jan. 24, 2018; Weatherup Dep. at 39:14-24.) Series A Preferred and Series B Preferred shares had a liquidation preference and a right of first refusal.[8] (Ex. D-26; Freeman Tr. at 33:6-8, Jan. 24, 2018.) Series A and Series B Preferred shares made up 55% of Pet360, and common shares made up the remaining 45%. (Weatherup Dep. at 40:2-14.) Covenant originally purchased Pet360's Series A Preferred shares,

---

[8] A right of first refusal meant that holders of Series A and B Preferred Stock of Pet360 had certain preferences on actions taken by the company and sellers of common stock. (Freeman Tr. at 33:12-16, Jan. 24, 2018.) For example, if any common shareholder was interested in selling shares, the preferred shareholder had the first right to buy the shares. (Id. at 33:16-18.) Like the preferred shareholders, Pet360 as a company also had the right to buy back the common shares. (Id. at 33:18-19.)

but they ultimately were converted into common shares, and thereafter, Covenant invested in and held only common shares. (Freeman Tr. at 203:7-10, Jan. 23, 2018.)

Between 1999 and 2013, Covenant acquired 7,795,000 common shares of Pet360. (Fretz Tr. at 39:25-40:10, Jan. 22, 2018.) The investment in Pet360 was one of Covenant's largest. (Id. at 40:3-5.) Freeman testified that Covenant invested approximately $2 million to acquire the total amount of shares it held in Pet360. (Freeman Tr. at 203:14-19, Jan. 23, 2018.) During the time that Covenant acquired these shares, Pet360 was very small startup company that had only about $100,000 in revenue. (Doc. No. 15 at 3; Fretz Tr. at 99:14-16, Jan. 23, 2018.)

Freeman served on Pet360's Board of Directors from approximately 2000 until February 2014, when he was removed by a vote of Pet360's common shareholders. (Doc. No. 15 at 3; Freeman Tr. at 202:13-24, Jan. 23, 2018.) From May 2009 until its acquisition by PetSmart in late September 2014, Brock M. Weatherup was CEO of Pet360. (Doc. No. 15 at 3; Freeman Tr. at 31:15-32:2, Jan. 24, 2018; Weatherup Dep. at 12:8-12.) When Weatherup became CEO of Pet360, Freeman had a good relationship with him, but after a period of time, their relationship changed. (Freeman Tr. at 32:3-7, Jan. 24, 2018.) Freeman said that the relationship declined because Weatherup did not like the way that Freeman was challenging him at board meetings regarding the performance of the company and was denying him bonuses. (Id. at 32:9-20.)

In addition to Covenant, Frorer Partners, a private limited partnership investment fund owned and controlled by an individual named Peter Frorer, also invested in Pet360 and held common shares beginning in 1999. (Fretz Tr. at 102:7-20, Jan. 23, 2018; Weatherup Dep. at 40:24-41:5.) Defendants met Frorer in approximately 1994 when he worked with them at Pennsylvania Merchant Group, a broker-dealer. (Fretz Tr. at 104: 3-5, Jan. 23, 2018.)

**B.     Covenant's Limited Partnership Agreement (LPA)**

As provided in Covenant's LPA, Defendants ran Covenant through the General Partner, CCMP.  Covenant's business and affairs were governed by the LPA, which granted the General Partner authority to engage in the activities set forth in the LPA.  (Doc. No. 15 at 1.)  The LPA provides that Covenant is a limited partnership under the Delaware Revised Limited Partnership Act ("Delaware Act") and that the Delaware Act governs the rights and liabilities of the partners, except as otherwise provided in the LPA.  (Ex. P-39, LPA §§ 1.2, 5.1.)

The LPA is dated June 15, 1999 and has been amended four times.  (Doc. No. 15 at 2; Fretz Tr. at 45:9-13, Jan. 23, 2018.)  The first amendment is dated November 26, 1996.  (Ex. P-39 at 6.)  The second amendment is dated July 30, 1999.  (Id. at 4.)  The third amendment is dated January 1, 2004 (id. at 2), and the fourth amendment is dated March 1, 2012 (Ex. P-40).

**1.     The General Partner's Investment and Management Authority, Including to Borrow in Covenant's Name and to Secure Such Borrowing with Covenant's Property**

The LPA grants the General Partner broad and exclusive management authority over Covenant's business, including the authority to borrow money in Covenant's name and to secure such borrowing with Covenant's property.  (Ex. P-39, LPA §§ 6, 12.1.)  Section 6 of the LPA governs the General Partner's investment activities, while § 12.1 governs the General Partner's Management of Covenant.  (Id.)  Section 6 of the LPA sets forth the scope of the "Investment Activities of the Partnership" and describes the investment activities in which Covenant can engage.  (Doc. No. 15 at 1; Fretz Tr. at 84: 2-4, Jan. 23, 2018.)  Section 6 provides as follows:

> 6. Investment Activities of the Partnership.  The purpose and business of the Partnership generally is to acquire, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in Securities and Commodity Interests, to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities and Commodity Interests held or owned by the Partnership, and to engage in any activity

incidental to the foregoing, including, without limitation, borrowing and lending Securities, Commodity Interests and funds and otherwise entering into credit arrangements in connection therewith. To these ends, the Partnership may enter into, make and perform all contracts and other undertakings and engage in all activities and transactions, as the General Partner may consider necessary or advisable to carry out the foregoing objects and purposes, including, without limitation:

(a) To acquire long positions or short positions with respect to Securities, to acquire positions in Commodity Interests and to make purchases or sales increasing, decreasing, covering and liquidating such positions;

(b) To borrow or raise monies and to obtain letters of credit without limitation as to amount, and to secure the payment of any obligation of the Partnership by mortgage on, or hypothecation or pledge of, all or any part of the property of the Partnership;

(c) To enter into custodian agreements with banks, securities brokerage firms and futures commission merchants (whether or not affiliated with the Partnership, the General Partner or any of its officers, directors or shareholders), to open, maintain and close bank and brokerage accounts and to draw checks or other orders for the payment of money or the delivery of instruments; and

(d) To hire full-time or part-time managers to manage and operate any asset of the Partnership, to hire or retain persons, such as attorneys, accountants, investment advisers and financial consultants, to perform services with respect thereto, and to purchase insurance.

Notwithstanding anything in this Agreement to the contrary, the Partnership may not engage in any such activities with respect to Commodity Interests unless, if required by the Commodity Exchange Act and the regulations thereunder, the General Partner has registered as a commodity pool operator with the Commodity Futures Trading Commission.

(Ex. P-39, LPA § 6.) Section 6(b) authorizes the General Partner to borrow money on behalf of

Covenant and to secure loans with a pledge of Covenant's assets. (Fretz Tr. at 84:12-18, Jan. 23,

2018; Seitz Tr. at 153:8-154:2, Jan. 24, 2018.)

Section 12.1 of the LPA sets forth the powers of the General Partner in managing

Covenant. (Doc. No. 15 at 1.) Section 12.1 provides in relevant part as follows:

12.1 <u>Management</u>. Subject only to the rights of the Limited Partners to vote or consent on specific matters as herein provided, the General Partner shall

have full, exclusive and complete authority in the management and control of the business of the Partnership for the purposes herein stated and shall make all decisions affecting the Partnership. The General Partner shall exercise the authority granted herein to the best of its abilities and shall use its best efforts to carry out the business of the Partnership as set forth in section 6.

(Ex. P-39, LPA § 12.1.) Section 12.1 then lists the "powers of the General Partner on behalf and at the expense of the Partnership." (Id.) Sections 12.1(d) and (g) give the General Partner the power to use Covenant's assets to secure borrowing in its business discretion. (Fretz Tr. at 93: 8-11, Jan. 23, 2018; Seitz Tr. at 152:1-19, Jan. 24, 2018.) Sections 12.1(d) and (g) provide that the General Partner can:

> (d) Sell (long or short), borrow, dispose of, trade or exchange the Partnership's assets for such consideration and on such other terms and conditions and evidenced by such documents or instruments as the General Partner deems appropriate;
>
> * * * *
>
> (g) Borrow money, Securities or Commodity Interests from banks and other lending institutions for any Partnership purpose and, in connection therewith, mortgage, pledge or hypothecate any assets of the Partnership, to secure repayment of the borrowed sums, and no bank, other lending institution or other person to which application for a loan is made by the General Partner shall be required to inquire as to the purposes for which such loan is sought, and as between the Partnership and such bank, other lending institution or person, it shall be conclusively presumed that the proceeds of such loan are to be and will be used for purposes authorized hereunder . . . .

(Ex. P-39, LPA § 12.1(d), (g).) In sum, under §§ 6 and 12.1 of the LPA, the General Partner was authorized to enter into loans on behalf of Covenant and to use Covenant's assets (including a pledge of Covenant's stocks) to secure those loans. (Fretz Tr. at 96:18-97:2, Jan. 23, 2018.)

## 2. The General Partner's and Defendants' Authority to Self-Deal and Have Conflicts of Interest

The LPA allows the General Partner and Defendants to self-deal and to have conflicts of interest with Covenant regarding investment and business activities. Section 7 of the LPA allows the General Partner and Defendants to engage in investment activities that may be the same or

affiliated with Covenant.  (Fretz Tr. at 85:15-19, Jan. 23, 2018.)  That is, § 7 allows Defendants

to self-deal with respect to investments on their own account even when a conflict of interest is

created by that activity.  (Id.)  Section 7 provides in relevant part as follows:

> 7.  Other Activities.   Any Partner and any of its officers, directors,
> shareholders and Affiliates may engage in any activities, whether or not related to
> the business of the Partnership, the Partners specifically recognizing that some or
> all of them and their Affiliates are engaged in various aspects of the securities and
> commodities businesses, both for their own accounts and for others, and such
> Partners and their officers, directors, shareholders and Affiliates may continue, or
> initiate further, such activities.  Each Partner agrees that any Partner, and any of
> its officers, directors, shareholders or Affiliates (a) may engage in or possess an
> interest, direct or indirect, in any business venture of any nature or description for
> his, her or its own account, independently or with others, including, without
> limitation, any business, industry or activity in which the Partnership may be
> interested in investing or may also have investments and (b) may do so without
> any obligation to report the same to the Partnership or any Partner or to afford the
> Partnership or any Partner any opportunity to participate therein. . . .

(Ex. P-39, LPA § 7.)  Correspondingly, § 8 of the LPA generally provides that conflicts of interest

will not prohibit Covenant from engaging in a transaction.  Section 8 reads as follows:

> 8. No Conflicts. The fact that any Partner, or any Affiliate of any Partner, or a member of
> his or her family, is employed by, or is directly or indirectly interested in or connected
> with, any person, firm or corporation employed or engaged by the Partnership to render
> or perform a service, or from whom the Partnership may make any purchase, or to whom
> the Partnership may make any sale, or from or to whom the Partnership may obtain or
> make any loan or enter into any lease or other arrangement, shall not prohibit the
> Partnership from engaging in any transaction with such person, firm or corporation, or
> create any additional duty of legal justification by such Partner or such person, firm or
> corporation beyond that of an unrelated party, and neither the Partnership nor any other
> Partner shall have any right in or to any revenues or profits derived from such transaction
> by such Partner, Affiliate, person, firm or corporation.

(Id., LPA § 8.)

### 3. The General Partner's Entitlement to a Management Fee and a Performance Fee

The LPA provides that the General Partner may be entitled to receive a Management Fee and a Profit Allocation ("Performance Fee"),[9] if certain conditions are met.  (Doc. No. 15 at 2.) Each year, the Management Fee and the Performance Fee were calculated by Covenant's outside accountant, Mark S. Carrow.  (Id.)  Although the Management Fee was paid each year, the Performance Fee was not always paid.  (Id.)  Section 10.7 of the LPA, titled "Allocations," addresses the General Partner's entitlement to a Performance Fee and reads as follows:

> 10.7 <u>Allocations</u>.  Profits and Losses shall be allocated to the Partners each Fiscal Quarter, as provided in this section 10.7.  Subject to the provisions below regarding the Profit Allocation and the special allocations relating to Hot Issues in section 10.7.3, all Profits and Losses for each Fiscal Quarter shall be allocated to the Partners in proportion to their respective Ownership Percentages as of the first day of such Fiscal Quarter.  If, for the applicable period described in the following paragraphs, the amount of Profit that otherwise would be allocated to a Limited Partner for that period based on the procedure described in the previous sentence exceeds that Limited Partner's remaining Unrecouped Losses, then twenty percent (20%) of such excess described in this Section 10.7 shall instead be allocated to the General Partner and eighty percent (80%) shall be allocated to that Limited Partner.  The amount of such excess allocated to the General Partner hereunder shall be referred to herein as the "Profit Allocation."
>
> Notwithstanding the provisions of the previous paragraph, to the extent that the Profit Allocation would reduce the amount of Profit that would otherwise be allocated to the Partner for a Fiscal Year to an amount that is less than the Partner's Preferred Return for the Fiscal Year, then the Profit Allocation shall be limited to the amount that the Profit that would otherwise be allocated to such Limited Partner (without giving effect to the Profit Allocation described in the previous paragraph) exceeds the Partner's Preferred Return.  To the extent that such Profit does not exceed the Partner's Preferred Return, then no Profit Allocation shall be made for the Fiscal Year and such Profit shall remain allocated to the Partners pursuant to the first sentence of this Section 10.7.
>
> The Profit Allocation shall first be made on December 31, 1996, for the period from the formation of the Partnership through that date.  Thereafter, for

---

[9] The parties agree that the term "Performance Fee" is synonymous with the term "Profit Allocation," which appears in the LPA.  (Doc. No. 15 at 2; Fretz Tr. at 86:19-24, Jan. 23, 2018; Freeman Tr. at 28:15-19, Jan. 24, 2018; Seitz Tr. at 147:10-19, Jan, 24, 2018.)  Thus, in this Opinion, the Court will refer to the Profit Allocation only as the Performance Fee.

each successive Fiscal Year the Profit Allocation shall be made on each December 31.

> The Profit Allocation shall be debited as of the end of each Fiscal Year from the Capital Account of each Limited Partner in the proportion in which he, she or it participated in such Profit for the applicable Fiscal Period. The total amount so debited shall be credited as of the end of that Fiscal Year to the Capital Accounts of the General Partner. If a Limited Partner withdraws on a date other than any December 31, the Profit Allocation shall be made with respect to that Limited Partner for the portion of the applicable Fiscal Period ending on the withdrawal date with respect to the amount withdrawn without giving effect to the Partner's Preferred Return. The General Partner, in its discretion, may waive or defer all or any portion of the Profit Allocation with respect to any Partner in any Fiscal Year.

(Ex. P-39, LPA § 10.7.)

Thus, under § 10.7, the General Partner would receive a Performance Fee if Covenant's quarterly profit that otherwise would be allocated to a Limited Partner exceeded that Limited Partner's unrecouped losses. (Id.) The Performance Fee was 20% of the excess from each Limited Partner's Capital Account. (Id.) Each Limited Partners' Capital Account contained the percentage of Covenant that each Limited Partner owned. (Fretz Tr. at 87:3-6, Jan. 23, 2018.) When a Performance Fee was earned, it was debited, or reduced, from the Capital Account of each Limited Partner at the end of each year. (Id. at 88:4-7; Carrow Tr. at 63:14-64:25, Jan. 25, 2018.) Each Limited Partner would pay a percentage of the profits of Covenant to the General Partner based on their ownership in Covenant. (Fretz Tr. at 89:3-6, Jan. 23, 2018.) The General Partner would get an increase in its account when the Performance Fee was received. (Carrow Tr. at 63:19-22, Jan. 25, 2018.)

Although § 10.7 addresses what occurs if a Limited Partner's profits exceed that Limited Partner's Unrecouped Losses,[10] the LPA does not address whether any Unrecouped Losses are

---

[10] Section 10.6 of the LPA defines the term "Unrecouped Losses" in pertinent part as follows: "The 'Unrecouped Losses' of a Limited Partner shall be all Losses allocated to such Limited

carried forward to the next fiscal year. Fretz testified that the Performance Fee was based on hitting a certain threshold on an annual basis as calculated each quarter and that if there was a loss in the prior year, that loss would not be carried forward to the next year. (Fretz Tr. at 97:3-10, Jan. 23, 2018.) Freeman also testified that based on his understanding of § 10.7, Covenant was not required to recoup losses from past years. (Freeman Tr. at 17:2-10, Jan. 24, 2018.)

In annually calculating the Performance Fee, Carrow relied on § 10.7 of the LPA. (Carrow Tr. at 60:5-15, 61:9-15, Jan. 25, 2018.) If Covenant took a loss for the year, the Performance Fee would not be paid. (Id. at 65:7-9.) Each year, each Limited Partner received a K-1[11] that showed any fees and expenses debited to that Limited Partner's Capital Account, including the Performance Fee. (Fretz Tr. at 89:7-22, Jan. 23, 2018.) The K-1s were prepared by Carrow and were sent to the Limited Partners. (Carrow Tr. at 66:25-67:10, Jan. 25, 2018.) The Performance Fee was shown on each K-1 as a reduction to that Limited Partner's Capital Account based on that Limited Partner's interest in Covenant. (See, e.g., Exs. D-12 at 23, D-13 at 22; Carrow Tr. at 67:23-24, Jan. 25, 2018.) Fretz testified that the Limited Partners never complained to him about the Performance Fees. (Fretz Tr. at 89:23-24, Jan. 23, 2018.)

In 2009 and 2010, Performance Fees were paid to the General Partner. (Doc. No. 15 at 2-3.) The General Partner received a Performance Fee of $409,373 in 2009 and a Performance Fee of $102,248 in 2010.[12] (Id.) The third amended LPA, § 10.7, which is quoted above, was in

---

Partner reduced (but not below zero) by all Profits subsequently allocated to such Limited Partner . . . ." (Ex. P-39, LPA § 10.6.)

[11] K-1 is a document that is part of a partnership tax return that reports to the individual investors the components of taxable income for which they are responsible and includes appreciation or loss and any expenses of the capital account for that particular year. (Carrow Tr. at 66:20-24, Jan. 25, 2018; Fretz Tr. at 98:16-20, Jan. 23, 2018.)

[12] The parties have stipulated that these were the amounts of the Performance Fees paid to the General Partner in 2009 and 2010. (Doc. No. 15 at 2-3.) Covenant's tax return for 2009,

effect in 2009 and 2010 when the Performance Fees were paid. (Freeman Tr. at 18:9-16, Jan. 24, 2018.) Carrow testified that he was concerned that awarding Performance Fees in 2009 and 2010 was inconsistent with the LPA because he believed § 10.7 required losses from previous years to be recouped before a Performance Fee could be paid, and Covenant had unrecouped losses from prior years. (Carrow Tr. at 121:13-24, Jan. 25, 2018.) As a result, Carrow asked Fretz for documentation on how the Allocation provision in § 10.7 was to be interpreted. (Id. at 121:25-122:2.) In response to the request, Fretz sent Carrow an email explaining how the Performance Fee was to be calculated and instructing him not to take into consideration unrecouped losses. (Id. at 120:12-25, 122:6-14.)

On March 1, 2012, the fourth amendment to the LPA was made following its approval by 86% of the Limited Partners. (Ex. P-40; Fretz Tr. at 47:19-48:3, Jan. 23, 2018.) The purpose of the fourth amendment was to clarify and ratify the method for calculating the Performance Fee, and specifically that Covenant did not have to recoup losses from prior years before the Performance Fee could be paid. (Fretz Tr. at 46:8-18, 96:5-17, Jan. 23, 2018.) That is, the fourth amendment to the LPA specified that unrecouped losses would not be carried forward to the next year. (Id. at 96:15-17.) The fourth amendment provides in pertinent part as follows:

> Section 2. Profits and Losses. Section 10.7 of the Agreement is amended to read in its entirety as follows:
>
> 10.7 Allocations. Profits and Losses shall be allocated to the Partners each Fiscal Year, as provided in this section l0.7. Subject to the provisions below regarding the Profit Allocation, including the special allocations relating to Hot Issues provided for in section 10.7.3, if the Profits for the Fiscal Year are equal to,

---

however, provides that the Performance Fee paid that year was $486,161. (Ex. D-12 at 4, 13; Carrow Tr. at 65:21-66:17, Jan. 25, 2018.) Covenant's tax return for 2010 provides that the Performance Fee paid that year was $67,398. (Ex. D-13 at 4, 12; Carrow Tr. at 69:18-70:17, Jan. 25, 2018.) Notwithstanding this discrepancy in the amounts, the Court need not resolve the issue of the correct Performance Fee amounts paid because, as will be discussed infra in the Conclusions of Law, Defendants did not breach their fiduciary duties by receiving these Performance Fees and thus the Trustee is not entitled to damages for them.

or exceed, the Partner's Preferred Return (a noncumulative return equal to five percent (5%) of the Partner's Capital Account as measured from the beginning of the Fiscal Year to the end of the Fiscal Year), then twenty percent (20%) of such return shall be allocated to the General Partner and eighty percent (80%) shall be allocated to the Limited Partner. The amount of such excess return allocated to the General Partner hereunder shall be referred to herein as the "Profit Allocation." Should the Partnership incur a loss or a return less than the Partner's Preferred Return, the General Partner shall not receive a Profit Allocation for such Fiscal Year and one hundred percent (100%) of the respective Profits or Losses shall be allocated to the Limited Partner's Capital Account in proportion to their respective Ownership Percentage. Any Unrecouped Losses incurred and allocated in previous years to the Limited Partner's Capital Account shall not impact or alter the Profit Allocation if such Partner's Preferred Return is achieved in a succeeding year.

The Profit Allocation shall first be made on December 31, 1996, for the period from the formation of the Partnership through that date. Thereafter, for each successive Fiscal Year the Profit Allocation shall be made on each December 31.

The Profit Allocation shall be debited as of the end of each Fiscal Year from the Capital Account of each Limited Partner in the proportion in which he, she or it participated in such net return for the applicable Fiscal Period. The total amount so debited shall be credited as of the end of that Fiscal Year to the Capital Accounts of the General Partner. If a Limited Partner withdraws on a date other than any December 31, the Profit Allocation shall be determined and calculated as of the withdrawal date. The General Partner, in its discretion, may waive or defer all or any portion of the Profit Allocation with respect to any Partner in any Fiscal Year.

(Ex. P-40.) Defendants were paid Performance Fees prior to the effective date of the fourth amended LPA, when Covenant had unrecouped losses from prior years. (Fretz Tr. at 49:1-3, Jan. 23, 2018.)

### C. From 2008 to 2010, Covenant Makes Loans to Keystone

From 2008 to 2010, Covenant's broker-dealer, Keystone, which also was partially owned by Defendants, experienced significant financial difficulty, was not profitable, and had net losses of approximately $600,000 per year. (Fretz Tr. at 23:10-16, Jan. 22, 2018.) Freeman testified that during this time, the entire industry was experiencing financial problems. (Freeman Tr. at

199:13-23, Jan. 23, 2018.)  In 2010, Keystone's audited financial statements contained a "going concern" clause.  (Doc. No. 15 at 2.)

Between April 28, 2008 and June 1, 2010, Covenant made loans to Keystone totaling $1,203,058.  (Doc. No. 15 at 2; Ex. D-10; Fretz Tr. at 25:23-25, Jan. 22, 2018.)  In 2008 and 2009, there were no loan documents to support these loans, but the loans were disclosed each year in the financial statements and tax returns of Keystone and in the tax returns of Covenant. (Fretz Tr. at 26:9-27:15, Jan. 22, 2018; Carrow Tr. at 72:20-73:11, Jan. 25, 2018.)  Defendants did not disclose in writing to Covenant's Limited Partners that Covenant was loaning money to Keystone, but Fretz testified that he talked to them and told most of them what Defendants were doing.  (Fretz Tr. at 36:24-37:17, Jan. 22, 2018.)

On June 1, 2010, Covenant made its final loan to Keystone for $15,000.  (Ex. D-10; Fretz Tr. at 141:21-25, Jan. 23, 2018.)  After the loans were made, Defendants executed, on behalf of Keystone, an unsecured promissory note to Covenant dated December 31, 2010 for $1,410,573, which represented the principal and accrued interest on the loans ("Keystone Note").  (Doc. No. 15 at 2; Ex. P-38; Fretz Tr. at 27:16-28:8, Jan. 22, 2018.)  The Keystone Note was signed by Fretz on behalf of Keystone and by Freeman on behalf of Covenant.  (Ex. P-38; Fretz Tr. at 29:9-12, Jan. 22, 2018.)  According to the terms of the Keystone Note, Keystone promised to repay the loans from Covenant within two years.  (Freeman Tr. at 231:13-15, Jan. 23, 2018.)  The loans were unsecured, that is, no collateral was provided to Covenant for them, and Keystone never repaid any of the principal or the interest on them.  (Fretz Tr. at 28:9-21, Jan. 22, 2018; 143:1-4, Jan. 23, 2018.)

But at the time the Keystone Note was signed, Freeman believed that the loans were a good use of Covenant's investors' funds.  (Id. at 232:7-9.)  He testified, "We had I believe three

deals at that moment that we were working on, any which of [sic] would have been able to repay this note and then some."  (Id. at 232:9-11.)  Both Fretz and Freeman described a 2011 transaction between Keystone and a Limited Partner of Covenant that had a sand mine business that ultimately raised $75 million, for which Keystone would have received a finder's fee, but which was never paid.  (Id. at 231:20-232:4; Fretz Tr. at 172:23-173:2, Jan. 23, 2018.)

Keystone eventually became the subject of an investigation by FINRA, which resulted in a fine of approximately $25,000 or $30,000 and the revocation of Keystone's license.  (Fretz Tr. at 23:3-4, 23:22-24, Jan. 22, 2018; Freeman Tr. at 200:8-12, Jan. 23, 2018.)  It also resulted in an order barring Defendants for life from associating with any FINRA member firm in any capacity. (Fretz Tr. at 3:16-23, Jan. 23, 2018; Freeman Tr. at 15-17, Jan. 23, 2018.)

At some point after the FINRA investigation began, Keystone closed and ceased doing business.  Although the parties stipulated that Keystone closed in 2010 (Doc. No. 15 at 2), Defendants both testified at trial that Keystone continued to operate after 2010.[13]  (Fretz Tr. at 16:4-19:10, Jan. 23, 2018; Freeman Tr. at 39:4-40:4, Jan. 24, 2018.)  In August 2013, FINRA cancelled Keystone's broker-dealer license.  (Ex. D-24; Fretz at 80:18-21, Jan. 23, 2018.)

### D.   Frorer Partners Makes Three Loans to Fretz, Freeman, and Covenant

In 2009, the Attorney General of Pennsylvania filed a lawsuit against Defendants, Covenant, and others in the Commonwealth Court of Pennsylvania, alleging wrongdoing related to a 2002 investment of $2.5 million that Covenant had accepted from a nonprofit entity known

---

[13]   Freeman testified that at the time he responded to the Interrogatory, he believed that Keystone closed in 2010 but that he since learned that Keystone operated after 2010. (Freeman Tr. at 39:8-26, Jan. 24, 2018.)  Although the Trustee argues that Defendants are bound by the their stipulation that Keystone ceased operating in 2010, the Court need not resolve this issue because, as will be discussed infra, any claim based on the Keystone loans is barred by the statute of limitations.

as Citizens Alliance for Better Neighborhoods,[14] formed by former Pennsylvania Senator Vincent Fumo ("Attorney General Lawsuit"). (Doc. No. 15 at 3; Fretz Tr. at 50:1-8, Jan. 22, 2018; Freeman Tr. at 204:22-205:9, Jan. 23, 2018.) During the course of the Attorney General Lawsuit, Defendants and Covenant incurred legal fees and, as a result, had to borrow money to pay for those fees. (Freeman Tr. at 205:19-206:11, Jan. 23, 2018.)

### 1. Frorer Partners Makes Three Loans to Fretz, Freeman, and Covenant, Each Secured with a Pledge of Pet360 Common Stock

In or around March 2011, Frorer Partners, controlled by Peter Frorer, made three separate loans to Fretz, Freeman, and Covenant. (Doc. No. 15 at 3; Fretz Tr. at 55:21-56:3, Jan. 22, 2018.) Frorer Partners lent Fretz $450,000 ("Fretz Loan"), lent Freeman $50,000 ("Freeman Loan"), and lent Covenant $300,000 ("Covenant Loan"). (These three loans will be referred to hereafter as the "Frorer Partners Loans"). (Doc. No. 15 at 3.)

Each loan was secured by separate collateral and verified by an individual promissory note and an individual stock pledge agreement that pledged shares of Pet360 common stock to secure the loan and provided for a maturity date of November 20, 2011. (Exs. D-2, D-3, D-4, D-5; Fretz Tr. at 56:24-57:7, Jan. 22, 2018; 103:15-22, 104:16-20, Jan. 23, 2018; Freeman Tr. at 207:12-208:11, Jan. 23, 2018.) The Fretz Loan was secured by a pledge of 339,365 shares of Pet360 stock, as well as land he owned in Costa Rica. (Ex. D-2; Fretz Tr. at 105:18-107:8, 109:3-17, Jan. 23, 2018.) The Freeman Loan was secured by a pledge of 400,000 shares of Pet360 stock. (Ex. D-4; Freeman Tr. at 36:13-37:2, Jan. 24, 2018.) And the Covenant Loan was secured by a pledge of 3,000,000 shares of Pet360 stock. (Ex. D-5; Fretz Tr. at 112:16-114:8, Jan. 23, 2018.) Although the loans may have been funded on different dates, the notes and pledges of shares for all three loans were executed on or about March 8, 2011 at Frorer's home in

---

[14] Citizens Alliance for Better Neighborhoods later was known as the Passyunk Avenue Redevelopment Corporation, or "PARC." (Doc. No. 15 at 3.)

Bryn Mawr, Pennsylvania. (Fretz Tr. at 106:24-107:20; Freeman Tr. at 215:11-22, Jan. 23, 2018; 36:13-37:5, Jan. 24, 2018.)

When the pledges of Pet360 shares were given to Frorer, as representative of Frorer Partners, they remained certificated in the name of the owner of the shares and were not retitled into the name of Frorer Partners at that time. (Exs. D-3, D-4, D-5; Fretz Tr. at 28:7-25, 124:20-8, Jan. 23, 2018; Freeman Tr. at 217:19-21, Jan. 23, 2018.) The Pledge of Shares of Stock for each loan provides the following language:

> The Pledgor understands that upon foreclosure the pledged shares may be sold at public auction or public sale. The Pledgor shall be provided reasonable notice of any said intended sale and the Pledgor shall have full rights to redeem said shares at any time prior to said sale upon payment of the balance due hereunder, and accrued costs of collection. In the event the shares shall be sold for less than the amount then owing, the Pledgor shall be liable for any deficiency.

> Upon payment of the obligation for which the shares are pledged, the shares shall be returned to the Pledgor and this pledge agreement shall be terminated.

(Exs. D-2, D-3, D-4, D-5.) Thus, by these paragraphs, if the Covenant Loan was paid off, the shares pledged as collateral for that loan would return to the owner of the shares. (Fretz Tr. at 108:14-20, 109:18-114:8, Jan. 23, 2018.) If the Covenant Loan defaulted, Frorer Partners would be entitled to receive the value of the principal of the loan plus interest. (Fretz Tr. at 117:2-5, Jan. 23, 2018; Freeman Tr. at 41:14-19, Jan. 24, 2018.)

### 2. The Pet360 Common Shares Had No Known Value When They Were Pledged as Collateral for the Frorer Partners Loans

In 2011, when Defendants and Covenant pledged Pet360 common shares as collateral for the Frorer Partners Loans, the shares had no known value. As noted, Pet360 was a small, private startup company with no publicly traded stock and had never turned a profit. (Doc. No. 15 at 3; Fretz Tr. at 99:23-100:1, Jan. 23, 2018.)

Even Brock M. Weatherup, CEO of Pet360 from 2009 until its acquisition by PetSmart in late September 2014, was unable to place a value on the common shares of Pet360 in 2011. He said that in 2011, there was no public market for the stock of Pet360. (Weatherup Dep. at 50:16-51:14.) He further stated that the only time Pet360 would value its common shares would be for a stock option grant of one form or another, and the valuation would be done to determine the exercise price of the option. (Id. at 47:3-17.)

Although the Trustee contends that 76 cents was an accurate valuation at the time for Pet360 common shares, no evidence supports this figure. In fact, when asked whether 76 cents was the correct value for Pet360 common shares in August 2012, Weatherup said he did not know what the reference point for 76 cents would be. (Id. at 45:16-46:4.) He continued, "I mean private companies are obviously very hard to value." (Id. at 46:2-4.) Freeman also confirmed that 76 cents was not a value for Pet360 common shares. (Freeman Tr. at 34:18-24, Jan. 24, 2018.)

When asked whether, before the PetSmart merger, the value of Pet360 common shares was anyone's guess, Weatherup said, "Correct. Well, it's always negotiated. It's always highly debatable. I mean you try and have valuation firms that, you know, do things, but they can always be wildly different." (Weatherup Dep. at 74:7-16.) Importantly, no expert valuation of the Pet360 shares was done in this case. (Seitz Tr. at 157:13-25, Jan. 24, 2018.) Based on the evidence of record, the value of Pet360 common shares in 2011, when the shares were pledged as collateral for the Frorer Partners Loan, was virtually unknown.

### 3. Covenant and Defendants Default on the Frorer Partners Loans, and Frorer Partners Demands Better Collateral for the Covenant Loan

None of the three Frorer Partners Loans were repaid by their maturity date of November 30, 2011, and each went into default at the end of 2011. (Fretz Tr. at 104:21-25, 114:12-16, Jan.

23, 2018; Freeman Tr. at 8:24-9:3, Jan. 24, 2018.) Consequently, in approximately August 2012, Peter Frorer contacted Fretz and informed him that since the loans were in default, the outside accounting firm, Rothstein Kass, was conducting an audit of Frorer Partners and was expressing concern about the value of the Frorer Partners Loans. (Doc. No. 15 at 3-4; Fretz Tr. at 61:22-25, 65:20-66:3, Jan. 22, 2018.) Because the loans were in default, they would have to be classified as "impaired"[15] in Frorer Partners' financial statements unless collateral was obtained to protect the loans' value and assure their collectability. (Doc. No. 15 at 3-4; Freeman Tr. at 216:1-10, Jan. 23, 2018.) Since the loans were impaired, those assets "would affect the performance fee for Frorer Partners." (Carrow Tr. at 85:6-8, Jan. 25, 2018; Fretz Tr. at 124:10-13, Jan. 23, 2018.)

Frorer Partners's audit originally was handled by Rothestein Kass, but in 2012, Frorer Partners switched accounting firms to Citrin, who completed the audit. (Doc. No. 15 at 4; Carrow Tr. at 104:13-105:7, Jan. 25, 2018.) Carrow was the Managing Partner at Citrin and the relationship partner responsible for Frorer Partners's audit. (Doc. No. 15 at 4; Carrow Tr. at 55:22-23, Jan. 25, 2018.) As noted, Carrow also was Covenant's longstanding outside CPA. (Doc. No. 15 at 4.)

Although the Covenant Loan already was supported by the collateral of the pledge of Pet360 shares, when the loan went into default, Frorer wanted better collateral to satisfy his auditors. (Fretz Tr. at 65:13-15, 67:23-68:1, 70:14-71:31, Jan. 22, 2018; 31:8-19, Jan. 23, 2018.) Frorer wanted the Pet360 shares to be retitled from the name of Covenant to the name of Frorer Partners. (Fretz Tr. at 31:8-19, 124:20-23, Jan. 23, 2018.) Fretz testified that he believed Frorer's auditors wanted the shares retitled because if they remained in the names of the borrowers, they would not be negotiable enough for Frorer to execute on them. (Id. at 129:14-

---

[15] The loans were "impaired" because interest payments were not being collected on them and they were not worth the face value of the loans. (Carrow Tr. at 77:6-22, Jan. 23, 2018.)

18.)  That is, there was a restriction on the back of the shares by which the preferred shareholders had a right of first refusal preventing the common shareholders from selling their shares without the approval of the preferred shareholders.  (Id. at 129:14-23.)

During the summer of 2012 began what would become an approximately yearlong battle between Defendants and Frorer and his auditors over retitling the Pet360 shares into the name of Frorer Partners.  (Id. at 125:9-14.)  On or about January 15, 2013, Covenant repaid Frorer Partners $125,000 of its loan.  (Fretz Tr. at 72:12-14, Jan. 22, 2018.)  After Covenant made this payment, Fretz requested that Frorer Partners release some of Covenant's Pet360 shares it had in its possession.  (Fretz Tr. at 133:21-24, Jan. 23, 2018.)  But Frorer Partners, at Frorer's direction, did not return any of Covenant's Pet360 shares.  (Id. at 134:4-5.)

Frorer continued to demand that the pledged Pet360 shares be retitled into the name of Frorer Partners.  Sometime at the end of February 2013, Fretz contacted Carrow regarding the creation of an option, or buyback, agreement between Covenant and Frorer Partners to protect the interest of the Pet360 shares given to Frorer Partners in the event of foreclosure of the shares.  (Carrow Tr. at 82:11-83:15, 114:16-23, Jan. 25, 2018.)  Carrow testified that in doing so, Fretz was trying to satisfy Frorer Partners to stop any foreclosure on the shares and was looking for a way to have an agreement by which Frorer would have control over the shares without the shares being lost or impaired by Covenant.  (Id. at 83:22-84:2.)

On February 20, 2013, Carrow sent an email to Peter Frorer, stating as follows: "I spoke to Bill [Fretz], it will not have any impact on covenant."  (Ex. D-2; Carrow Tr. at 82:4-10, Jan. 25, 2018.)  Carrow testified that in this email, he was referring to the option, or buyback, agreement.  (Carrow Tr. at 82:9-11, Jan. 25, 2018.)  That same day, Fretz sent an email to Frorer regarding the retitling of the Pet360 shares, which reads as follows:

> Ok Peter as I've said I'm happy to do it with Mark's support. Mark has all of my 2012 stuff. I will contact him today. I will also get the buy back agreement set up. You hold our 3million shares. Why don't you send them to Matt Murray and we can start the process.

(Ex. D-8.) Fretz testified that in this email, he was discussing retitling the shares into the name of Frorer Partners. (Fretz Tr. at 128:2-130:10, Jan. 23, 2018.) Fretz testified that he relied on the advice of his accountant, Carrow, that the retitling of shares would have no impact on Covenant. (Id. at 129:24-130:20.)

Carrow disputes this testimony, however, and said that he never told Defendants that transferring title to the Pet360 shares from Covenant to Frorer Partners would have no impact. (Carrow Tr. at 112:5-8, Jan. 25, 2018.) Carrow testified that when the shares were retitled, that transaction would in fact have to be reflected on Covenant's tax returns because the transfer was a taxable event. (Id. at 109:20-110:7.) Carrow explained that when he used the phrase "no impact," he meant that an option agreement between the parties would have no impact. (Id. at 84:3-6.) Ultimately, no buyback agreement for the Pet360 shares was entered into. (Fretz Tr. at 37:18-19, 39:4-15, Jan. 23, 2018.)

Peter Frorer also executed a Personal Guarantee dated February 23, 2013 by which he personally guaranteed Frorer Partners' loan to Covenant. (Ex. D-20; Carrow Tr. at 79:14-80:4, 180:20-21, Jan. 25, 2018.) This Personal Guarantee was part of the additional collateral that Frorer Partners obtained to support the three loans. (Carrow Tr. at 80:5-7, Jan. 25, 2018.)

> a. **In March 2013, Title to 2,978,989 Pet360 Common Shares and in September 2013, Title to 2,000,000 Pet360 Common Shares Are Transferred into the Name of Frorer Partners**

After extensive negotiations and Frorer's repeated threats to sue Covenant and Defendants on behalf of Frorer Partners, Defendants agreed to transfer to Frorer Partners' title to the Pet360 shares that had been pledged as collateral for the Covenant Loan. (Fretz Tr. at 126:3-

12, Jan. 23, 2018; Freeman Tr. at 219:16-220:4, Jan. 23, 2018.)  Accordingly, on or about March 27, 2013, Covenant transferred title to 2,978,989 Pet360 common shares into the name of Frorer Partners ("March 2013 Transfer").  (Ex. P-18; Fretz Tr. at 29:1-12, Jan. 23, 2018.)

The transfer of title to the Pet360 shares had to be approved by Pet360's preferred shareholders, so to effectuate the transfer, Fretz sought the assistance of Matthew Murray, controller of Pet360, who generally handled transfers of shares.  (Ex. D-19; Fretz Tr. at 30:5-19, Jan. 23, 2018; Freeman Tr. at 53:8-54:4, Jan. 24, 2018; Weatherup Dep. at 58:4-19.)  Pet360 approved the transfer of title to the shares from Covenant to Frorer Partners.  (Freeman Tr. at 220:20-24, Jan. 23, 2018; Weatherup Dep. at 66:2-14.)  The March 2013 Transfer was authorized by an "Agreement, Certification and Acknowledgement," signed by Defendants on behalf of Covenant.  (Ex. P-18; Freeman Tr. at 220:5-22, Jan. 23, 2018.)

After the March 2013 Transfer, Frorer continued to demand more Pet360 shares to further collateralize the Frorer Partners Loans.  (Doc. No. 15 at 4.)  On September 15, 2013, at the direction of Defendants, Covenant transferred title of an additional 2,000,000 Pet360 common shares into the name of Frorer Partners ("September 2013 Transfer").  (Id.; Fretz Tr. at 35:6-10, Jan. 23, 2018.)  A lawyer was not involved in the transfer of the shares.  (Fretz Tr. at 35:14-25, Jan. 23, 2018.)

### b.   At No Point Were the Frorer Partners Loans Consolidated but Instead Always Were Treated as Separate Loans

The evidence of record does not prove that the Frorer Partners Loans ever were consolidated or treated as one single obligation but instead shows that they always were treated as separate loans.  No evidence was presented at trial that the loans ever were treated as a single obligation on Covenant's books and records or that any of Covenant's funds ever were used to

pay the loans as a single obligation.  Fretz confirmed that none of Covenant's money was ever used to pay either of Defendants' personal loans.  (Fretz Tr. at 122:11-13, Jan. 23, 2018.)

At some point, Defendants signed a document titled "Collateral Release and Loan Extension Agreement" ("Collateral Release") to extend the Covenant Partners Loan because the original note for the loan, signed on or about March 8, 2011, had expired.  (Doc. No. 15 at 4; Fretz Tr. at 21:4-6, 22:19-23:12 Jan. 22, 2018.)  Although the Trustee argues that the Collateral Release consolidated all three loans, Defendants deny that the version of the Collateral Release in evidence is the version they signed.  (Ex. P-19; Fretz Tr. at 73:24-74:13, Jan. 22, 2018; Freeman Tr. at 221:10-222:16, Jan. 23, 2018.)  Defendants do not have a copy of the Collateral Release they signed.  (Fretz Tr. at 21:4-8, Jan. 23, 2018; Freeman Tr. at 5:4-6, Jan. 24, 2018.) Regardless, the Collateral Release in evidence, which Defendants argue is not the version they signed, makes no reference to Defendants' personal loans from Frorer Partners.  (Fretz Tr. at 119:8-13, Jan. 23, 2018.)  And although the Collateral Release in evidence references a note attached as Addendum A, a note was neither attached nor ever located.  (Id. at 115:19-23.)

Finally, an Assignment dated December 31, 2013, by which Frorer Partners assigned each loan to Peter Frorer in exchange for Frorer's payment of $800,000, is further evidence that the Frorer Partners Loans were at all times treated separately.[16]  (Ex. D-25 at 2-3.)  The Assignment lists each loan separately and attaches as Exhibits the promissory notes for each loan.  (Id.)  Accordingly, the evidence of record does not support a finding that the Frorer Partners Loans ever were consolidated.

---

[16] Peter Frorer attached this Assignment to his Proof of Claim in Covenant's Chapter 7 bankruptcy case.  (Ex. D-25.)

## E. Events Following the March and September 2013 Transfers of Title to the Pet360 Common Shares

After the September 2013 Transfer, Frorer continued to demand additional Pet360 common shares from Covenant, but Covenant did not transfer any more shares to Frorer Partners or to Frorer individually. (Doc. No. 15 at 4.) The evidence showed that it was the intent of Covenant and of Frorer Partners that Covenant's Pet360 shares would be returned to it once the Covenant Loan was repaid. And as noted, in the event the Covenant Loan went into default, Frorer Partners would be entitled to only the value of the loan's principal and interest, and any value in the Pet360 shares above that amount would be returned to Covenant. (Fretz Tr. at 122:5-8, Jan. 23, 2018; Freeman Tr. at 41:14-19, Jan. 24, 2018.) But at the end of 2013, Peter Frorer refused to return Covenant's Pet360 shares in exchange for other collateral. (Fretz Tr. at 52:17-23, Jan. 23, 2018; Carrow Tr. at 101:4-8, Jan. 25, 2018.)

In December 2013, Carrow found out that title to Covenant's Pet360 shares had been transferred into the name of Frorer Partners without an option agreement. (Carrow Tr. at 116:10-13, Jan. 25, 2018.) When he found out, Carrow told Fretz that transferring title to the shares without an option agreement was a taxable event and that if his firm were to prepare tax returns for Covenant for 2013, they would have to reflect the transfer. (Id. at 113:21-25.) Carrow also told Fretz he would not list the Pet360 shares on Covenant's tax returns as an asset because Covenant no longer owned them. (Id. at 110:1-11.) For this reason, he was terminated as Covenant's accountant. (Id.) Thereafter, by Assignment dated December 31, 2013, Frorer assigned all three Frorer Partners Loans from Frorer Partners to himself individually for the sum of $800,000, which was paid through a charge against his personal capital account at Frorer Partners. (Ex. D-25; Carrow Tr. at 89:12-19, Jan. 25, 2018.)

### F. Freeman Is Removed from the Pet360 Board, and Pet360 and PetSmart Discuss PetSmart's Potential Acquisition of All Pet360's Common Shares

In December 2013, Weatherup traveled to Phoenix, Arizona to meet with the then CEO of Petsmart, David Lenhardt, and discussed with Lenhardt a potential acquisition of Pet360 by PetSmart ("PetSmart merger"). (Weatherup Dep. at 76:16-77:1.)

By the beginning of 2014, Peter Frorer owned at least 12,581,044 common shares of Pet360, making him the largest common shareholder.[17] (Ex. D-15; Weatherup Dep. 42:16-18.) As noted, by that time, the relationship between Freeman and Weatherup had deteriorated, and Weatherup wanted Freeman removed from the Pet360 Board. (Freeman Tr. at 32:3-20, 43:2-10, 54:15-23, Jan. 24, 2018; Weatherup Dep. at 138:3-10.) Now that Frorer was the majority shareholder of Pet360 common stock, Weatherup saw this as an opportunity to remove Freeman from the Board by Frorer voting his shares. (Weatherup Dep. at 138:5-139:2; 144:12-21.) In February 2014, Frorer voted his shares and the shares that had been transferred to him from Covenant to remove Freeman, and Freeman was removed from Pet360's Board. (Freeman Tr. at 202:22-203:3, Jan. 23, 2018; Weatherup Dep. at 42:6-18.)

At some point after Frorer became Pet360's largest common shareholder, Weatherup had him sign a confidentiality agreement so that he could be more open with Frorer about Pet360's business.[18] (Weatherup Dep. at 132:19-133:15.) On February 21, 2014, Weatherup met with Frorer at Pet360's offices and informed Frorer that Pet360 was "getting some overtures from various organizations about potential acquisition." (Weatherup Ex. 6.)

---

[17] A shareholder list sent on February 26, 2013 shows that Peter Frorer held 10,581,044 shares of Pet360 common stock, including the 2,978,989 shares that he would acquire in March 2013. (Ex. D-15.) By holding these shares, he owned 28.16 percent of the common stock. (Id.) Add to this total the 2,000,000 shares he acquired in September 2013. By the beginning of 2014, Frorer held at least 12,581,044 common shares of Pet360.

[18] Although Peter Frorer was a major shareholder of Pet360, he was never on the Board of Directors. (Weatherup Dep. at 112:18-2.)

On June 11, 2014, Frorer sent an email to Fretz and his attorney purporting to "foreclose" on the Pet360 shares that were transferred in the March and September 2013 Transfers and indicating that he intended to keep all of the Pet360 shares for himself.  (Doc. No. 15 at 5.)

On June 30, 2014, Lenhardt signed and sent a letter of intent ("LOI") on behalf of PetSmart to Weatherup proposing to purchase all the common stock of Pet360.  (Ex. D-17; Doc. No. 15 at 5; Weatherup Dep. at 30:3-33-5.)  The LOI provided that total consideration for the purchase would be $160 million, with $130 million in cash and $30 million paid through an earn-out.[19]  (Ex. D-17; Weatherup Dep. at 91:13-17.)  It further provided that the transaction would be structured as a merger, with Pet360 becoming a subsidiary of PetSmart.  (Ex. D-17.) Weatherup signed the LOI on July 1, 2014.  (Weatherup Dep. at 92:1-8.)

Thereafter, on July 9, 2014, Weatherup and Frorer met at Pet360's offices, and Weatherup informed Frorer of the terms of the LOI that Lenhardt recently had sent.  (Weatherup Ex. 6; Doc. No. 15 at 5; Weatherup Dep. at 30:3-33:5.)  Weatherup explained to Frorer the total purchase price of the Petsmart merger and that it was expected to result in a common share purchase price of slightly under $1.[20]  (Doc. No. 15 at 5; Weatherup Dep. at 98:24-100:10.)

---

[19]   An earn-out is "a financial technique that results in future payments to a seller contingent on the target achieving defined financial or nonfinancial objectives after completion of the deal." Corporate Acquisitions, Mergers & Divestitures § 1:21 (Westlaw 2018)

[20]   On August 5, 2014, Weatherup met with Frorer at a restaurant named Redstone to tell him that the PetSmart "deal was dead."  (Weatherup Ex. 6; Weatherup Dep. at 100:24-102:7.) Then, on August 19, 2014, Weatherup called Forer and explained that the PetSmart merger was back on, that it was signed, and that it was going to be announced later that day. (Weatherup Ex. 6; Weatherup Dep. at 102:16-21.)

### G. Frorer Purchases the Judgment from the Attorney General Lawsuit Through Tripartite, Causes a Writ of Execution to Be Issued, and Obtains Another 2,766,398 Common Shares of Pet360 Held by Covenant

On July 30, 2014, Frorer executed an Assignment Agreement with the Commonwealth of Pennsylvania through the Attorney General pursuant to which Frorer or his "controlled designee" would purchase the $2.5 million judgment that had been entered against Covenant on April 3, 2013 in the Attorney General Lawsuit, at a price substantially below the judgment amount.[21] (Doc. No. 15 at 5.) To purchase the judgment pursuant to the Assignment Agreement, Frorer formed an entity named Tripartite, in which he was the controlling and Managing Member. (Id.)

Thereafter, Frorer took steps on behalf of Tripartite to cause the Prothonotary to issue a writ of execution to execute on the judgment. (Id.) The writ of execution resulted in a writ of attachment being directed to Pet360 as garnishee, requiring it to attach property in its possession belonging to Covenant, including any Pet360 common shares. (Id.) Tripartite then obtained an order prohibiting Covenant from transferring or selling its Pet360 common shares and requiring that the common shares be surrendered to the custody of the Prothonotary. (Id.) Accordingly, on September 11, 2014, Covenant surrendered 2,766,398 shares of Pet360 common stock to the Prothonotary to comply with the writ of attachment.[22] (Id.; Ex. D-22 ¶ K.)

### H. PetSmart Purchases All of the Common Shares of Pet360, and Pet360 Merges with PetSmart

On August 21, 2014, the PetSmart merger was announced to the public, and on approximately September 29, 2014, the merger closed. (Doc. No. 15 at 6; Fretz Tr. at 57:24-

---

[21] On April 3, 2013, the Commonwealth Court had entered a judgment against Covenant, Defendants, and others in the amount of $2.5 million as a result of the Attorney General Lawsuit regarding the Citizens investment in Covenant. (Doc. No. 15 at 3.)

[22] Once Covenant entered Chapter 7 bankruptcy, the automatic bankruptcy stay prevented further disposition of the Pet360 shares that had been surrendered to the Prothonotary. (Ex. D-22 ¶ K.) The shares then were turned over to the Trustee. (Id.)

58:5, Jan. 23, 2018; Weatherup Dep. at 15:9-13, 80:4-20.)  Neither Fretz nor Freeman knew

about the merger before August 21, 2014.  (Weatherup Ex. 6; Fretz Tr. at 135:2-5, Jan. 23, 2018;

Freeman Tr. at 42:7-23, Jan. 24, 2018.)  Freeman also confirmed that while he was on the Pet360

Board, he did not know anything about the merger.  (Freeman Tr. at 43:11-17, Jan. 24, 2018.)

Total consideration for the PetSmart merger, as described in the LOI, was $160 million,

with $130 million of the consideration in cash and a $30 million earn-out, which ultimately was

not paid.  (Weatherup Dep. at 78:14-79:7.)  Following the Petsmart merger, the 4,978,989

common shares that had been transferred from Covenant to Frorer Partners during the March and

September 2013 Transfers were redeemed for cash consideration of approximately $0.793 per

common share, totaling $3,948,338.28.  (Doc. No. 15 at 6.)

### I.     Covenant Files a Chapter 7 Bankruptcy Petition in an Attempt to Recover the Pet360 Common Shares that Had Been Transferred to Frorer

After the PetSmart merger was announced on August 21, 2014, counsel for Defendants

spoke with the SEC to find a solution to the fact that Frorer still held Covenant's Pet360 shares.

(Fretz Tr. at 135:12-25, Jan. 23, 2018.)  Defendants testified that the SEC suggested they file a

Chapter 7 petition for bankruptcy on behalf of Covenant to get the shares back.  (Id. at 136:1-4;

Freeman at 47:3-9, Jan. 24, 2018.)

On September 19, 2014, Defendants caused Covenant to file a Chapter 7 petition in the

Bankruptcy Court with the goal of getting the Pet360 shares that had been transferred to Frorer

Partners returned.[23]  (Doc. No. 15 at 6; Ex. D-16; Fretz Tr. at 137:3-8, Jan. 23, 2018; Freeman Tr.

at 47:6-9, Jan. 24, 2018.)  On September 22, 2014, Gary F. Seitz was appointed Trustee.  (Doc.

No. 15 at 6.)  He testified that after he was appointed, the SEC informed him that "there was a

transaction that had been approved that was about to close imminently that would result in

---

[23]   The Chapter 7 bankruptcy petition is captioned In re Covenant Partners, L.P., Case No. 14-17568(SR) (E.D. Pa. Bankr. Sept. 19, 2014).

certain assets that had been transferred away from [Covenant] that could potentially go to an individual that may leave the country with those assets," referring to Froer. (Seitz Tr. at 87:4-8. Jan. 24, 2018.) Defendants assisted the Trustee in his efforts to recover the Pet360 shares that had been transferred to Frorer Partners by providing him with documents and information. (Fretz Tr. at137:19-24, Jan. 23, 2018; Freeman Tr. at 47:10-17, Jan. 24, 2018.)

On March 24, 2015, the Trustee and Defendants entered into a Tolling Agreement, effective that same day. (Doc. No. 15 at 6; Ex. D-14.) On April 15, 2016, they entered into an Addendum that extended the Tolling Agreement until March 24, 2017 (together, "Tolling Agreement"). (Id.) On August 22, 2016, counsel for Defendants terminated the Tolling Agreement. (Id.) The Tolling Agreement states that the Trustee continues to investigate facts and circumstances surrounding Covenant's collapse and potential claims for wrongs committed against it before its bankruptcy proceedings, including potential claims against Defendants. (Ex. D-14 ¶¶ F-G.) Although the Tolling Agreement tolls any statute of limitations, laches period, or other period related to the timeliness of a claim, it does not toll (or revive) any statute of limitations, laches, or other time period that had already expired before the Tolling Agreement's effective date of March 24, 2015. (Id. ¶¶ 1, 4.) As to claims already expired, the Tolling Agreement provides as follows:

> 4. The parties agree that this Tolling Agreement shall not in any manner revive any claims or causes of action that are already barred prior to the effective date of this Tolling Agreement by any statute of limitations, laches, or other defenses based on the timeliness of the assertion of any claims.

(Id. ¶ 4.) On August 22, 2016, counsel for Defendants terminated the Tolling Agreement by letter. (Id. at 18.)

On December 19, 2014, the Trustee commenced and prosecuted an adversary proceeding against Peter Frorer, Frorer Partners, Frorer Associates, LLC, Tripartite, and the Prothonotary, to

recover the Pet360 shares. (Doc. No. 15 at 6.) The Trustee brought claims against Frorer and his related entities for fraudulent transfers, fraud, conversion, unjust enrichment, aiding and abetting breach of fiduciary duty, and other related claims. (Ex. P-42; Seitz Tr. at 95:24-10; 141:2-10, Jan. 24, 2018.) In the adversary proceeding, the Trustee sought to unwind the transfer of the following Covenant Pet360 shares to Frorer Partners and the proceeds from the sale of those shares to PetSmart: (1) 2,978,989 Pet360 common shares retitled to Frorer Partners on March 27, 2013; (2) 2,000,000 Pet360 common shares retitled to Frorer Partners on September 15, 2013; and (3) 2,766398 Pet360 common shares surrendered to the Prothonotary for Tripartite on September 11, 2014, for a total of 7,745,387 of Covenant's Pet360 common shares owned or controlled by Frorer. (Ex. D-22 at 3-4.)

This action was settled in June 2016, and the Bankruptcy Court approved the settlement on August 8, 2016. (Doc. No. 15 at 6.) As a result of the settlement, Covenant's bankruptcy estate recovered the proceeds of all of these Pet360 shares at the full price paid for them by PetSmart in the PetSmart merger, bringing in $6,897,729.13 to Covenant's bankruptcy estate. (Ex. P-43, § 2; Seitz Tr. at 102:1-103:14, Jan. 24, 2018.)

Later, in November 2016, Covenant's bankruptcy estate recovered an additional $627,054.43 in distributions regarding the Pet360 shares through the settlement of shareholder lawsuit that had been filed by Pet360's common shareholders in the Court of Chancery of Delaware, Flax v. Petco, Inc., Civ. A. No. 10123-VCL (Del. Ch. 2016). (Doc. No. 15 at 6.) This shareholder lawsuit was spearheaded by Freeman. (Freeman Tr. at 50:2-51:2, Jan. 24, 2018.)

Before Covenant filed its Chapter 7 petition, the SEC had been investigating certain transactions involving Covenant. (Doc. No. 15 at 7; Seitz Tr. at 86:19-87:11, Jan. 24, 2018.) In August 2015, the Trustee and the SEC entered into a settlement in which the SEC received an

unsecured claim[24] against Covenant for $5,830,510. (Doc. No. 15 at 7.) On December 2, 2015, the Bankruptcy Court approved the SEC settlement. (Id.) Defendants each also entered into separate Offers of Settlement with the SEC. (Id.)

On July 18, 2016, the Trustee filed this action in the Bankruptcy Court against Defendants, alleging one count of breach of fiduciary duty of care and loyalty and seeking to recover the amount of the SEC's claim and other alleged damages related to the recovery of the Pet360 shares and other expenses allegedly incurred in pursuing the Frorer parties. (Ex. P-1.)

## III. CONCLUSIONS OF LAW[25]

The Trustee alleges that Defendants breached their fiduciary duties to Covenant by: (1) causing Covenant to make unauthorized loan advancements to Keystone from 2008 to 2010; (2) causing Covenant to issue unearned Performance Fees to its General Partner in 2009 and 2010; (3) causing Covenant to improperly transfer its Pet360 shares to Frorer Partners in March and September 2013; (4) using Covenant's Pet360 shares as collateral for their personal loans from Frorer Partners by consolidating their loans with the Covenant Loan; and (5) failing to account for various assets of Covenant. (Ex. P-1 ¶ 173; Doc. No. 37.) Defendants have advanced numerous arguments on why each of the Trustee's theories for breach of fiduciary duty fails.

A four-day bench trial was held on the breach of fiduciary duty claim. During the bench trial, "in addition to resolving legal issues, the [Court's] role . . . includes evaluating the

---

[24] An unsecured claim is a "claim by a creditor who does not have a lien or a right of setoff against the debtor's property." Unsecured Claim, Black's Law Dictionary (10th ed. 2014).

[25] Throughout this litigation, the parties and the Bankruptcy Court have assumed that Delaware law applies to the Trustee's claim for breach of fiduciary duty. (Doc. Nos. 36, 37; Adversary No. 16-00226, Doc. Nos. 82, 124.) Because the parties do not dispute the choice of laws to apply and because the LPA states that Covenant is a limited partnership under the Delaware Act and that the Delaware Act governs the rights and liabilities of the partners (Ex. P-39, LPA §§ 1.2, 5.1), the Court will apply Delaware law to the Trustee's claim for breach of fiduciary duty.

credibility of witnesses and weighing the evidence." <u>Sayre v. Customers Bank</u>, Civ. A. No. 14-3740, 2017 WL 2439551, at *6 (E.D. Pa. June 6, 2017) (alteration and omission in original) (quoting <u>Baker v. Baker</u>, No. 10-1955, 2011 WL 129164, at *1 n.1 (E.D. Pa. Jan. 12, 2011)); <u>see also</u> Fed. R. Civ. P. 52(a); <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 856 (1982). In accordance with Federal Rule of Civil Procedure 52(a), the Court will now state its conclusions of law.

In stating its conclusions of law, the Court first will address the three Motions in Limine filed by Defendants before trial. Then, it will discuss what fiduciary duties were owed by Defendants. Finally, the Court will discuss each of the Trustee's theories for breach of fiduciary duty and Defendants' arguments in opposition to it. As previously noted, because the Trustee has not met his burden to prove by a preponderance of the evidence that Defendants breached their fiduciary duties to Covenant, judgment will be entered in favor of Defendants.

### A.      Defendants' Motions in Limine

As an initial matter, Defendants filed three Motions in Limine in the Bankruptcy Court, which they renewed in this Court. The Court will address each Motion in Limine in turn.

### 1.      Defendants' Motion in Limine to Preclude SEC Offer of Settlement Will Be Denied as Moot

Defendants argue that the Court should exclude all SEC Offers of Settlement from evidence because they are barred under Federal Rules of Evidence 408 and 410. Rule 408 addresses the admissibility of compromise offers and negotiations, while Rule 410 concerns the admissibility of pleas, plea discussions, and related statements. Fed. R. Evid. 408, 410. The Trustee responds that he is not seeking the admission into evidence of any of the SEC Offers of Settlement and therefore there is nothing for the Court to rule on regarding this Motion. Because the Trustee is not seeking the admission of the SEC Offers of Settlement and because the Court

has not considered the SEC Offers as evidence, this Motion in Limine (Bankruptcy Adversary No. 16-00226-SR, Docket No. 64) will be denied as moot.

<blockquote>

**2.**  **Defendants' Motion in Limine to Bar Evidence from the SEC's Investigation Will Be Granted**

</blockquote>

Defendants assert that since the SEC Offers of Settlement are inadmissible, all other evidence derived from the Trustee's negotiations with the SEC and which led to the SEC Offer of Settlement should also be excluded under Federal Rule of Evidence 408 and under Federal Rules of Evidence 801 and 802 as inadmissible hearsay. In response, the Trustee argues that regarding evidence of the SEC's investigation, Defendants have not identified any outstanding issues upon which the Court must rule or any particular Exhibit to which this Motion relates. The Trustee also states that the Court has already ruled at trial on Defendants' objection to evidence relating to negotiations with the SEC. (See Trial Tr. at 114:13-118:16, Jan. 24, 2018.)

Any evidence regarding the Trustee's negotiations with the SEC is inadmissible as evidence of a compromise or settlement under Rule 408 and as hearsay under Rules 801 and 802. Rule 408 provides in relevant part as follows:

> **(a) Prohibited Uses.** Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> **(1)** furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> **(2)** conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408(a). Here, any evidence regarding the Trustee's negotiations with the SEC is inadmissible as evidence relating to an offer of settlement and as conduct during negotiations regarding the settlement of a claim. Further, as the Court already ruled at trial, evidence derived

from the Trustee's negotiations with the SEC is inadmissible hearsay under Rules 801 and 802. (See Trial Tr. at 114:2-118:16, Jan. 24, 2018); Fed. R. Evid. 801, 802. Accordingly, Defendants' Motion in Limine (Bankruptcy Adversary No. 16-00226-SR, Docket No. 66) to preclude evidence from the SEC's investigation will be granted.[26]

### 3. Defendants' Motion in Limine to Exclude the Hearsay Statements of Frorer Will Be Denied

Finally, Defendants argue that any evidence containing statements made by Peter Frorer should be excluded as inadmissible hearsay. Defendants further assert that they have repeatedly attempted to depose Frorer but to no avail, that he is living permanently in Costa Rica, and that any statements made by him are highly suspect and should be excluded from evidence as inadmissible hearsay. The Trustee responds that the Court should deny Defendants' Motion in Limine (Bankruptcy Adversary No. 16-00226-SR, Docket No. 68 ) to exclude all of Frorer's out of court statements because the Court cannot make a blanket ruling regarding all of Frorer's statements but instead must address each statement and its particular purpose individually.

The Court will deny Defendants' Motion in Limine (Bankruptcy Adversary No. 16-00226-SR, Docket No. 68) insofar as it seeks to exclude all of Frorer's out of court statements wholesale. The Court acknowledges, however, that any evidence containing Frorer's out of court statements offered to prove the truth of the matter asserted in the statements is inadmissible unless it fits within an exception to the rule against hearsay. See Fed. R. Evid. 801, 803, 804. Accordingly, if the Court were to consider any of Frorer's statements, the Court would have to

---

[26] Defendants also argue that the Trustee should be barred from using certain damages evidence at trial based on his failure to comply fully in discovery with the damage disclosure requirements of Federal Rule of Civil Procedure 26(a)(1)(A)(iii) and because there is an absence of proof to support punitive damages. As will be discussed infra, because the Court finds that Defendants did not breach any fiduciary duty to Covenant, Defendants' Motion in Limine (Bankruptcy Adversary No. 16-00226-SR, Docket No. 66) on this basis will be denied as moot.

address each statement individually, determine the purpose for which the Trustee was relying on the statement, and identify the hearsay exception that applies to it. Since this litigation culminated in a bench trial, the Court was tasked with evaluating the credibility of witnesses and weighing the evidence in the case. See Fed. R. Civ. P. 52(a); Sayre, 2017 WL 2439551, at *6. In weighing the evidence, the Court considered Frorer's statements to be generally unreliable and without strong probative value and therefore did not base its findings of fact on them. See Fed. R. Evid. 403. For these reasons, Defendants' Motion in Limine (Bankruptcy Adversary No. 16-00226-SR, Docket No. 68 ) to exclude Frorer's hearsay statements will be denied.

### B. The Trustee's Claims for Breach of Fiduciary Duty Based on the Loan Advances to Keystone and the Performance Fees Are Barred by the Statute of Limitations

#### 1. Pennsylvania's Two-Year Statute of Limitations Applies

The parties seem to have assumed that Delaware's statute of limitations applies to the breach of fiduciary duty claim.[27] The Court finds to the contrary, however, that Pennsylvania's two-year statute of limitations applies to the breach of fiduciary duty claim.

Federal courts apply the choice of law rules of the forum state, which in this case is Pennsylvania. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); see also LaSala v. Bordier et Cie, 519 F.3d 121, 139-140 (3d Cir. 2008). Pennsylvania courts ordinarily apply Pennsylvania statutes of limitations unless Pennsylvania's "Borrowing Act" applies. Deleski v. Raymark Indus., Inc., 819 F.2d 377, 379 n.2 (3d Cir. 1987). Under Pennsylvania's Borrowing Act, "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim." 42 Pa.

---

[27] In their Proposed Conclusions of Law, Defendants address in the alternative the application of the Pennsylvania statute of limitations. (Doc. No. 36 at 59-64.)

Cons. Stat. Ann. § 5521(b); <u>Riggs v. AHP Settlement Trust</u>, 421 F. App'x 136, 138 (3d Cir. 2011).

Under Delaware law, the statute of limitations for breach of fiduciary duty is three years. Del. Code Ann. Tit 10 § 8106(a); <u>see also</u> <u>In re Am. Int'l Grp., Inc.</u>, 965 A.2d 763, 812 (Del. Ch. 2009) ("For breach of fiduciary duty or fraud claim, the statute of limitations is three years."). Under Pennsylvania law, the statute of limitations for breach of fiduciary duty is two years.  42 Pa. Cons. Stat. Ann. § 5524(7); <u>see also</u> <u>Weis-Buy Servs., Inc. v. Paglia</u>, 411 F.3d 415, 422 (3d Cir. 2005) (stating that in Pennsylvania, breach of fiduciary duty claims "must be brought within two years of the date the claim accrues").  Since Pennsylvania's statute of limitations "first bars the claim," Pennsylvania's statute of limitations applies.  42 Pa. Cons. Stat. Ann. § 5521(b).

Along with Pennsylvania's statute of limitations, this Court also must apply Pennsylvania law governing relevant tolling principles.  <u>Weis-Buy Servs., Inc.</u>, 411 F.3d at 422; <u>In re Mushroom Transp. Co.</u>, 382 F.3d 325, 335 (3d Cir. 2004) (quoting <u>Island Insteel Sys., Inc. v. Waters</u>, 296 F.3d 200, 210 n.4 (3d Cir. 2002)); <u>Debeic v. Cabot Corp.</u>, 352 F.3d 117, 128 (3d Cir. 2003); <u>Bohus v. Beloff</u>, 950 F.2d 919, 924 (3d Cir. 1991).  Thus, the Court will apply Pennsylvania's two-year statute of limitations and tolling principles to the breach of fiduciary duty claim.

Under Pennsylvania law, "the statute of limitations begins to run as soon as a right to institute and maintain suit arises."  <u>Schmidt v. Skolas</u>, 770 F.3d 241, 250 (3d Cir. 2014) (quoting <u>Haugh v. Allstate Ins. Co.</u>, 322 F.3d 227, 231 (3d Cir. 2003)).  Ordinarily, a plaintiff's "lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." <u>Mest v. Cabot Corp.</u>, 449 F.3d 502, 510 (3d Cir. 2006) (quoting <u>Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.</u>, 468 A.2d 468, 471 (1983)).

## 2.    Equitable Tolling by the Discovery Rule or Fraudulent Concealment

Under Pennsylvania law, however, "certain tolling principles" may apply "to ameliorate the sometimes-harsh effects of the statute of limitations." Bohus, 950 F.2d at 924. The discovery rule "is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." Schmidt, 770 F.3d at 251 (quoting Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000)). Under Pennsylvania's discovery rule, "the statute of limitations will not begin to run until 'the plaintiff reasonably knows, or reasonably should know (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'" In re Mushroom Transp. Co., 382 F.3d at 338 (quoting In re TMI, 89 F.3d 1106, 1116 (3d Cir. 1996)); see also Schmidt, 770 F.3d at 251. "For the statute of limitations to run, a plaintiff need not know the 'exact nature' of his injury, as long as it objectively appears that the plaintiff 'is reasonably charged with the knowledge that he has an injury caused by another.'" Mest, 449 F.3d at 510-11 (quoting Ackler v. Raymark Indus., Inc., 551 A.2d 291, 293 (1988)).

Plaintiff generally "bears the burden of showing that the discovery rule tolls the statute of limitations." Schmidt, 770 F.3d at 251 (citing Dalrymple v. Brown, 701 A.2d 164, 167 (1997)). "Pennsylvania's formulation of the discovery rule reflects a narrow approach 'to determining accrual for limitations purposes' and places a greater burden upon Pennsylvania plaintiffs vis-á-vis the discovery rule than most other jurisdictions." Blanyar v. Genova Prods. Inc., 861 F.3d 426, 432 (3d Cir. 2017) (quoting Gleason v. Borough of Moosic, 15 A.3d 479, 484 (Pa. 2011)). "The discovery rule will only toll the statute of limitations where the plaintiff shows that he or she has exercised 'reasonable diligence' in ascertaining the existence of the injury and its cause." In re Mushroom Transp. Co., 382 F.3d at 338 (quoting Bohus, 950 F.2d at 925).

Reasonable diligence means that the plaintiff "pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." Mest, 449 F.3d at 511 (quoting Cochran v. GAF Corp., 666 A.2d 245, 249 (Pa. 1995)). Although "the reasonable diligence test accounts for the different capacities of different plaintiffs, the test is nonetheless an objective one." Perelman v. Perelman, 545 F. App'x 142, 149 (3d Cir. 2013) (quoting Kach v. Hose, 589 F.3d 626, 642 n.17 (3d Cir. 2009)). The existence of reasonable diligence is to be determined by the factfinder. Id. (citing Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005)).

Correspondingly, under Pennsylvania law, equitable tolling can suspend the statute of limitations from running in three circumstances:

> "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994) (citations omitted). Like the discovery rule, equitable tolling requires the plaintiff to demonstrate "that he or she could not, by the exercise of reasonable diligence, have discovered essential information bearing on his or her claim." Id. at 1390 (citation omitted).

In re Mushroom Transp. Co., 382 F.3d at 338-39. Under the first circumstance, "equitable tolling is appropriate to avoid unjust results where there has been fraudulent concealment." Wise v. Mortg. Lenders Network USA, Inc., 420 F. Supp. 2d 389, 394 (E.D. Pa. 2006) (citation omitted). Pennsylvania's fraudulent concealment doctrine applies to toll the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry." Mest, 449 F.3d at 516 (quoting Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556 (3d Cir. 1985)). Under the fraudulent concealment doctrine, "[t]here must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." Id. at 517 (quoting Bohus, 950 F.2d at 925). "Silence can

43

constitute fraud only where there is an affirmative duty to disclose because of a fiduciary relationship between the parties or a similar relationship of trust and confidence." Id. (citations omitted). As a result, "the presence of a fiduciary relationship would be pertinent to the question of when a plaintiff's duty to investigate arose." In re Mushroom Transp. Co., 382 F.3d at 343 (quoting Gurfein v. Sovereign Grp., 826 F. Supp. 890, 919 n.31 (E.D. Pa. 1993)). But the presence of a fiduciary relationship "is not dispositive." Perelman, 545 F. App'x at 150 (citing In re Mushroom Transp. Co., 382 F.3d at 343).

Defendants submit that the Trustee's claim for breach of fiduciary duty based on Covenant's loan advances to Keystone and the payments of unearned Performance Fees is barred by the statute of limitations. In response, the Trustee appears to invoke the discovery rule and the doctrine of fraudulent concealment to toll the applicable statute of limitations, arguing that Defendants did not disclose their conduct to Covenant's investors. The Court will address each set of transactions in turn.

### 3. The Trustee's Claim for Breach of Fiduciary Duty Based on the Loan Advancements Made to Keystone Is Time-Barred

The evidence at trial showed, and the parties have stipulated, that between April 28, 2008 and June 1, 2010, Covenant made loans to Keystone totaling $1,203,058. (Doc. No. 15 at 2; Ex. D-10; Fretz Tr. at 25:23-25, Jan. 22, 2018.) Under Pennsylvania law, the statute of limitations began to run for each loan advancement on the date that that loan advancement was made. See Schmidt, 770 F.3d at 250. Thus, the statute of limitations for the final loan advancement, made on June 1, 2010, began to run on that date and must have been brought within two years of June 1, 2010. See 42 Pa. Cons. Stat. Ann. § 5524(7). Accordingly, to be within the statute of limitations, a breach of fiduciary duty claim for Defendants' conduct in making the final loan advancement should have been brought by June 1, 2012. Any claim for breach of fiduciary duty

based on even the most recent loan advancement therefore expired twenty-seven months before the filing of Covenant's Chapter 7 petition on September 19, 2014. The Trustee filed this adversary proceeding on July 18, 2016. Although the parties had entered into a Tolling Agreement on March 24, 2015, this claim had already expired by that point, and the Tolling Agreement did not revive any expired claims. Accordingly, the Trustee's breach of fiduciary duty claim based on the loan advancements to Keystone is barred by the statute of limitations.

In addition, no equitable tolling principle applies to resurrect a breach of fiduciary duty claim based on the loan advancements to Keystone. As noted, the Trustee bore the burden at trial of showing that the statute of limitations should be tolled. The Trustee failed to meet his burden of proving that either the discovery rule or the doctrine of fraudulent concealment should apply. As to the discovery rule, the Trustee was required to show that Covenant or its investors exercised "'reasonable diligence' in ascertaining the existence of the injury and its cause." In re Mushroom Transp. Co., 382 F.3d at 338 (quoting Bohus, 950 F.2d at 925). The Trustee has provided no evidence to support an argument that despite exercising reasonable diligence, Covenant or its investors failed to discover that the loans were made.

As to fraudulent concealment, the Trustee has failed to provide evidence that Defendants took any affirmative action to conceal or mislead Covenant's investors from discovering the loans. Rather, the evidence at trial showed that the loans to Keystone were disclosed in Covenant's tax returns, as well as its books and records. (Fretz Tr. at 26:9-27:15, Jan. 22, 2018; Carrow Tr. at 72:20-73:11, 117:19-24, Jan. 25, 2018.) And although Defendants did not disclose to investors in writing that they were loaning money to Keystone, Fretz testified that he talked to the investors and told many of them what Defendants were doing. (Fretz Tr. at 36:24-37:17, Jan. 22, 2018.)

The Trustee has put forth no evidence here of any affirmative conduct on the part of Defendants to conceal the loan advances being made and thus has failed to prove fraudulent concealment. Compare Faber v. Wells Fargo Bank, Civ. A. No. 15-00191, 2015 WL 1636967, at *3 (E.D. Pa. Apr. 13, 2015) (holding that fraudulent concealment did not toll statute of limitations where bank honored checks they knew or should have known were forged but did not hide the fact that they honored the checks because bank took no affirmative steps to conceal its conduct), with Lichtenstein v. Kidder, Peabody & Co. Inc., 840 F. Supp. 374, 389 (W.D. Pa. 1993) (finding fraudulent concealment where an employee of defendant securities firm made deposits into plaintiff client's account to cover up forgeries that were occurring).

Not only did the evidence show that Defendants did not conceal the loans, it also did not show that assuming Defendants had a fiduciary duty to the investors, they were ever silent about the loans. Based on this record, the Trustee has failed to meet his burden of proving that any equitable tolling principle applies to toll the statute of limitations for breach of fiduciary duty based on the loans Defendants caused Covenant to make to Keystone. Accordingly, the Trustee's claim based on this conduct is barred by the statute of limitations.

### 4. The Trustee's Claim for Breach of Fiduciary Duty Based on the Performance Fees Is Time-Barred

As noted, in 2009 and 2010, Defendants were awarded Performance Fees through the General Partner pursuant to § 10.7 of the LPA. Under Pennsylvania law, the statute of limitations began to run for each Performance Fee on the date that that Performance Fee was paid. See Schmidt, 770 F.3d at 250. As a result, any claim for breach of fiduciary duty based on the Performance Fee paid in 2009 must have been brought by 2011, and any claim based on the Performance Fee paid in 2010 must have been brought by 2012, within two years of the payment of each Performance Fee. § 5524(7). Thus, any breach of fiduciary duty claim based on the

Performance Fees expired long before Covenant filed its Chapter 7 petition and accordingly is barred by the statute of limitations.

Like the loans to Keystone, no equitable tolling principle applies to the breach of fiduciary duty claim based on the Performance Fees. Neither the discovery rule nor the doctrine of fraudulent concealment applies to the Performance Fees because the evidence showed that the Performance Fees and their amounts were disclosed to the limited partners each year in their K-1 tax documents. Each year, each Limited Partner received a K-1 tax document prepared by Carrow that showed the Performance Fee debited from that Limited Partner's account. (See, e.g., Exs. D-12 at 23, D-13 at 22; see also Fretz Tr. at 89:7-22, Jan. 23, 2018; Carrow Tr. at 66:25-67:10, Jan. 25, 2018.)

The Trustee has put forth no evidence that Defendants ever took any affirmative action in an effort to conceal the fact that they were awarded Performance Fees in 2009 and 2010. The Trustee argues that Defendants failed to disclose that the Performance Fees were not being calculated in accordance with the LPA. But this is merely the Trustee's legal argument about how the LPA should be interpreted. Defendants testified at trial that they thought the Performance Fees were being calculated in accordance with the proper interpretation of the LPA. (Fretz Tr. at 97:3-10, Jan. 23, 2018; Freeman Tr. at 17:2-10, Jan. 24, 2018.) The Trustee has failed to meet his burden of showing that equitable tolling should apply to the Performance fees. For all these reasons, any claim based on the award of Performance Fees is therefore barred by the statute of limitations.

### C. Defendants Owed a Duty of Care to Covenant But Did Not Owe a Duty of Loyalty and Only Owed the Duty Described in Sections 7 and 8 of the LPA

In addressing the internal affairs of a limited partnership, a court's first task is to determine what duty a general partner owes to the limited partners. Gerber v. EPE Holdings,

LLC, C.A. No. 3543, 2013 WL 209658, at *5 (Del. Ch. Jan. 18, 2013) (citing In re K-Sea

Transp. Partners L.P. v. Unitholders Litig., C.A. No. 6301, 2012 WL 1142351, at *5 (Del. Ch.

Apr. 4, 2012)).   Under the Delaware Revised Uniform Limited Partnership Act ("Delaware

Act"), a partner in a limited partnership owes the duties of care and loyalty to the partnership.

Del. Code Ann. tit. 6 § 15-404(a).   A partner's duty of loyalty to the partnership and to the

partners is as follows:

> (1) To account to the partnership and hold as trustee for it any property, profit or
> benefit derived by the partner in the conduct or winding up of the partnership
> business or affairs or derived from a use by the partner of partnership property,
> including the appropriation of a partnership opportunity;
>
> (2) To refrain from dealing with the partnership in the conduct or winding up of
> the partnership business or affairs as or on behalf of a party having an interest
> adverse to the partnership; and
>
> (3) To refrain from competing with the partnership in the conduct of the
> partnership business or affairs before the dissolution of the partnership.

§ 15-404(b).   And a partner's duty of care to the partnership and to the partners "is limited to

refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a

knowing violation of law."  § 15-404(c).

"Absent a contrary provision in the partnership agreement, the general partner of a

Delaware limited partnership owes the traditional fiduciary duties of loyalty and care to the

Partnership and its partners."  Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., No. Civ.

A. 15754, 2000 WL 1476663, at *10 (Del. Ch. Sept. 27, 2000).  But a court will only apply the

Delaware Act's default fiduciary duty rules if the partners "have not expressly made provisions

in their partnership agreement."  Gerber, 2013 WL 209658, at *6 (quoting In re LJM2 Co-Inv.,

L.P., 866 A.2d 762, 777 (Del. Ch. 2004)).

The policy of the Delaware Act is "to give maximum effect to the principle of freedom of

contract and to the enforceability of partnership agreements."   Del. Code Ann. tit. 6 § 17-

1101(b); <u>Wenske v. Blue Bell Creameries, Inc.</u>, C.A. No. 2017-0699, 2018 WL 3337531, at *12 (Del. Ch. Jul. 6, 2018) (quoting <u>Norton v. K-Sea Transp. Partners L.P.</u>, 67 A.3d 354, 360 (Del. 2013)). To that end, the Act provides that "a Delaware limited partnership may within its limited partnership agreement 'expand, restrict, or eliminate any fiduciary duties that a partner or other person might otherwise owe' to the limited partnership or another partner." <u>Wenske</u>, 2018 WL 3337531, at *12 (quoting <u>Norton</u>, 67 A.3d at 360); Del. Code Ann. Tit. 6 § 17-1101(d).

The Delaware Act, § 17-1101(d), provides as follows:

(d) To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

§ 17-1101(d). That is, under the Act, an LPA may "disclaim fiduciary duties, and replace them with contractual duties." <u>Brinckerhoff v. Enbridge Energy Co., Inc.</u>, 159 A.3d 242, 252 (Del. 2017) (citing § 17-1101(d)).

Accordingly, if an LPA has validly disclaimed fiduciary duties, "limited partners cannot rely on traditional fiduciary principles to regulate the general partner's conduct" but "must look exclusively to the LPA's complex provisions to understand their rights and remedies." <u>Id.</u> at 252-53 (second citing <u>Gotham Partners LP v. Hallwood Realty Partner L.P.</u>, 817 A.2d 160, 170 (Del. 2002)). A court's analysis, then, "must focus on, and examine, the precise language of the LPA that is at issue." <u>Id.</u> at 253 (quoting <u>DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.</u>, 75 A.3d 101, 106-07 (Del. 2013)).

"[P]rinciples of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain." <u>Brickell Partners v. Wise</u>, 794 A.2d 1, 3-4 (Del. Ch. 2001) (quoting <u>Sonet v. Timber Co.</u>, 722 A.2d 319, 322 (1998)). In requiring that

parties to a limited partnership make their intentions to displace fiduciary duties plain, however, Delaware courts "err[] on the side of flexibility regarding the type of evidence sufficient to support a judicial finding that such an intention existed." R.M.S. Inc. v. All. Capital Mgmt. Holdings, L.P., 790 A.2d 478, 497 (Del. Ch. 2001). The Court of Chancery of Delaware has explained:

> Resisting the temptation to resolve hairsplitting questions by reference to maxims of interpretation, our courts have thus far adhered as a general matter to a close examination of whether the application of default fiduciary duties can be reconciled with the practical and efficient operation of the terms of the limited partnership agreement. Where such a reconciliation is possible, the court will apply default fiduciary duties in the absence of clear contractual language disclaiming their applicability. But where the use of default fiduciary duties would intrude upon the contractual rights or expectations of the general partner or be insensible in view of the contractual mechanisms governing the transaction under consideration, the court will eschew fiduciary concepts and focus on a purely contractual analysis of the dispute. Put somewhat differently, the irreconcilability of fiduciary duty principles with the operation of the partnership agreement can itself be evidence of the clear intention of the parties to preempt fiduciary principles.

Id. at 497-98 (footnote omitted). To understand a limited partnership's "intended governance structure," the court must "read the Agreement as a whole, and not just concentrate on one provision that mentions one of the 'magic words.'" Sonet, 722 A.2d at 324.

Against this framework, the Court turns to Covenant's LPA. Section 1.2 of the LPA provides that Covenant is a limited partnership under the Delaware Act and that the Act governs the rights and liabilities of the partners, except as otherwise provided in the LPA. (Ex. P-39, LPA § 1.2.) Section 12.1 sets forth the powers of the General Partner in managing Covenant, providing as follows:

> 12.1 Management. Subject only to the rights of the Limited Partners to vote or consent on specific matters as herein provided, the General Partner shall have full, exclusive and complete authority in the management and control of the business of the Partnership for the purposes herein stated and shall make all decisions affecting the Partnership. The General Partner shall exercise the

authority granted herein to the best of its abilities and shall use its best efforts to carry out the business of the Partnership as set forth in section 6.

(Id., LPA § 12.1.)  As noted, § 12.1 then lists the "powers of the General Partner on behalf and at the expense of the Partnership," including the power to use Covenant's assets to secure borrowing in its business discretion.  (Id.; Fretz Tr. at 93: 8-11, Jan. 23, 2018; Seitz Tr. at 152:1-19, Jan. 24, 2018.)

Additionally, as noted earlier, §§ 7 and 8 of the LPA allow the General Partner to self-deal and have conflicts of interest with Covenant regarding investments and business activities.  (Ex. P-39, LPA §§ 7, 8.)  Section 7 provides in relevant part:

> 7. Other Activities.  Any Partner and any of its officers, directors, shareholders and Affiliates may engage in any activities, whether or not related to the business of the Partnership, the Partners specifically recognizing that some or all of them and their Affiliates are engaged in various aspects of the securities and commodities businesses, both for their own accounts and for others, and such Partners and their officers, directors, shareholders and Affiliates may continue, or initiate further, such activities.  Each Partner agrees that any Partner, and any of its officers, directors, shareholders or Affiliates (a) may engage in or possess an interest, direct or indirect, in any business venture of any nature or description for his, her or its own account, independently or with others, including, without limitation, any business, industry or activity in which the Partnership may be interested in investing or may also have investments and (b) may do so without any obligation to report the same to the Partnership or any Partner or to afford the Partnership or any Partner any opportunity to participate therein. . . .

(Id., LPA § 7.)  Moreover, Section 8 provides as follows:

> 8. No Conflicts.  The fact that any Partner, or any Affiliate of any Partner, or a member of his or her family, is employed by, or is directly or indirectly interested in or connected with, any person, firm or corporation employed or engaged by the Partnership to render or perform a service, or from whom the Partnership may make any purchase, or to whom the Partnership may make any sale, or from or to whom the Partnership may obtain or make any loan or enter into any lease or other arrangement, shall not prohibit the Partnership from engaging in any transaction with such person, firm or corporation, or create any additional duty of legal justification by such Partner or such person, firm or corporation beyond that of an unrelated party, and neither the Partnership nor any other Partner shall have any right in or to any revenues or profits derived from such transaction by such Partner, Affiliate, person, firm or corporation.

(Id., LPA § 8.)

51

Here, Covenant's LPA has not disclaimed the General Partner's duty of care but has disclaimed its duty of loyalty. As to the duty of care, the closest the LPA comes to addressing this duty is in § 12.1, which states that "[t]he General Partner shall exercise the authority granted herein to the best of its abilities and shall use its best efforts to carry out the business of the Partnership." (Id., LPA § 12.1.) By this language, the LPA has not made its intentions to disclaim a duty of care "plain." Brickell Partners, 794 A.2d at 3-4 (quoting Sonet, 722 A.2d at 322). Instead, reconciliation of the default duty of care and the operation of the terms of the LPA is possible and would not "intrude upon the contractual rights and expectations of the general partner." R.M.S., Inc., 790 A.2d at 497. Thus, the Court will apply the default duty of care in this case, which, as noted, is "to refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." § 15-404(c).

By contrast, §§ 7 and 8 of Covenant's LPA contradict the default duty of loyalty by allowing the General Partner to self-deal and have conflicts of interest with Covenant and thus disclaims the traditional duty of loyalty. (Ex. P-39, LPA § 12.1.) In this case, the default duty of loyalty would "intrude upon the contractual rights or expectations of the general partner" given that the LPA unambiguously provides that the General Partner may self-deal and have conflicts of interest with Covenant regarding investments and business activities. See R.M.S., Inc., 790 A.2d at 497; Gotham Partners, L.P., 2000 WL 1476663, at *10 ([W]here the Partnership Agreement provides the standard that will govern the duty owed by a General Partner to its partners in self-dealing transactions, it is the contractual standard and not the default fiduciary duty of loyalty's fairness standard that exclusively controls."). Accordingly, the General Partner's conduct here is not regulated by the traditional duty of loyalty but instead by §§ 7 and 8 of the LPA. In sum, therefore, the traditional duty of care applies while the traditional duty of

loyalty does not apply and is replaced by the contractual provisions of the LPA. For this reason, any claim by the Trustee based on breach of loyalty fails as a matter of law.

> **D. Defendants Did Not Breach Their Duty of Care or the Contractual Provisions of the LPA by Pledging or Retitling Covenant's Pet360 Common Shares as Collateral for the Covenant Loan**

Because, as noted, the default duty of care applies to Defendants' conduct, but the default duty of loyalty does not, the Court need only determine whether Defendants' actions violated the duty of care. The Court also will discuss, however, Defendants' actions in the context of what was required of them by LPA.

As previously explained, under the Delaware Act, a partner's duty of care to the partnership and to the partners "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." Del. Code Ann. tit. 6 § 15-404(c). The duty of care requires that partners "inform themselves, before making a business decision, of all material information reasonably available to them . . . and reasonably inform themselves of alternatives." Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 192 (Dec. Ch. 2005) (first citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000); than citing UIS, Inc. v. Walbro Corp., 1987 WL 18108, at *2 (Del. Ch. Oct. 6, 1987)). To be informed, partners must consider reasonably available material facts that are "relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decision making." Sutherland v. Sutherland, C.A. No. 2399, 2013 WL 2362263, at *11 (Del. Ch. May 30, 2013) (quoting Brehm v. Eisner, 746 A.2d 244, 260 n.49 (Del. 2000)).

"[L]iability for breaching the duty of care 'is predicated upon concepts of gross negligence." Id. (quoting Aronson, 473 A.2d at 812). To find gross negligence, "the decision has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of

discretion." <u>In re Zale Stockholders Litig.</u>, Civ. A. No. 9388, 2015 WL 6551418, at *4 (Del. Ch. Oct. 29, 2015) (quoting <u>Solash v. Telex Corp.</u>, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988)). Put another way, gross negligence has a "stringent meaning" under Delaware partnership law, "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." <u>Albert v. Alex Brown Mgmt. Servs., Inc.</u>, No. Civ. A. 762, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) (citation omitted). To prevail on a breach of duty of care claim, a plaintiff must prove "that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason.'" <u>Id.</u> (citations omitted).

Here, the Trustee has failed to prove that Defendants engaged in "grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law" in pledging and later retitling Covenant's Pet360 common shares as collateral for the Covenant Loan. <u>See</u> § 15-404(c). The evidence showed that on or about March 8, 2011, Frorer Partners made a loan to Covenant for $300,000. (Doc. No. 15 at 3.) Around that same time, Defendants caused Covenant to pledge 3,000,000 shares of its Pet360 common stock as collateral to secure the loan. (Ex. D-5; Fretz Tr. at 106:24-107:20, 112:16-114:8, Jan. 23, 2018; Freeman Tr. at 215:11-22, Jan. 23, 2018; 36:13-37:5, Jan. 24, 2018.) Language in the Pledge of Shares provided that when the Covenant Loan was paid off, the shares pledged as collateral would return to Covenant. (Ex. D-5; Fretz Tr. at 108:14-20, 109:18-114:8, Jan. 23, 2018.) The Trustee presented no evidence that this action was in any way grossly negligent so as to breach Defendant's duty of care. To the contrary, §§ 6(b) and 12.1(g) of Covenant's LPA expressly allow the General Partner to borrow money on behalf of Covenant and to secure loans with a pledge of Covenant's assets. (Ex. P-39, LPA §§ 6, 12.1(g); Fretz Tr. at 84:12-18, 96:18-97:2, Jan. 23, 2018; Seitz Tr. at 153:8-154:2, Jan. 24, 2018.)

By December 2011, the Covenant Loan had not been repaid and was in default. (Fretz Tr. at 104:21-25, 114:12-16, Jan. 23, 2018; Freeman Tr. at 8:24-9:3, Jan. 24, 2018.) As a result, Frorer, on behalf of Frorer Partners, began to demand better collateral to secure the defaulted Covenant Loan and wanted the Pet360 shares retitled from the name of Covenant into the name of Frorer Partners. (Fretz Tr. at 65:13-15, 67:23-68:1, 70:14-71:31, Jan. 22, 2018; 31:8-19, 124:20-23, Jan. 23, 2018.) For approximately a year, Defendants battled with Frorer and his auditors over the retitling. (Fretz Tr. at 125:9-14, Jan. 23, 2018.) During this time, Fretz reached out to Carrow, Covenant's accountant, regarding the possibility of creating an option, or buyback agreement between Covenant and Frorer Partners in an effort to stop the impending foreclosure of the Pet360 shares. (Carrow Tr. at 82:11-84:2, 114:16-23, Jan. 25, 2018.)

After extensive negotiations and Frorer's repeated threats to sue Covenant and Defendants on behalf of Frorer Partners, Defendants agreed to transfer to Frorer Partners title to the Pet360 shares that had been pledged as collateral for the Covenant Loan. (Fretz Tr. at 126:3-12, Jan. 23, 2018; Freeman Tr. at 219:16-220:4, Jan. 23, 2018.) Accordingly, on or about March 27, 2013, Covenant transferred title to 2,978,989 Pet360 common shares into the name of Frorer Partners. (Ex. P-18; Fretz Tr. at 29:1-12, Jan. 23, 2018.) Fretz testified that he did so in reliance on Carrow's advice that the retitling would have no impact on Covenant. (Fretz Tr. at 129:24-130:20, Jan. 23, 2018.) Carrow said that he never told Fretz that retitling would have no impact but instead had been referring to a potential buyback agreement when he gave that advice. (Carrow Tr. at 84:3-6, 112:5-8, Jan. 25, 2018.) This contradictory testimony does not mean that Defendants acted in violation of the duty of care. Fretz's recollection that he relied on the advice of their accountant is viewed by the Court as misunderstanding of what the accountant advised. It does not rise to the level of "grossly negligent or reckless conduct, intentional misconduct or a

knowing violation of law".  After the March 2013 Transfer, Frorer continued to demand more Pet360 shares to further collateralize the Frorer Partners Loans, and on September 15, 2013, at the direction of Defendants, Covenant transferred title of an additional 2,000,000 Pet360 common shares into the name of Frorer Partners.  (Doc. No. 15 at 4; Fretz Tr. at 35:6-10, Jan. 23, 2018.)

Most importantly, the evidence at trial showed that at the time the shares were pledged and at the time the shares were retitled, the Pet360 common shares had no known value.  Even Pet360's own CEO at the time said that in 2011, there was no public market for Pet360 stock.  (Weatherup Dep. at 50:16-51:14.)  He further explained that until Pet360's acquisition by PetSmart in late September 2014, the Pet360 shares were always highly negotiable, highly variable, and very hard to value.  (Id. at 46:2-4, 74:7-6.)  During the time of the events challenged by the Trustee, Pet360 was a small, private startup company with no publicly traded stock and had never turned a profit.  (Doc. No. 15 at 3.)  Furthermore, no expert valuation of the Pet360 shares was done in this case.  (Seitz Tr. at 157:13-15, Jan. 24, 2018.)

In pledging and then retitling the Pet360 shares into the name of Frorer Partners as collateral for the defaulted Covenant Loan, Defendants acted in an informed manner, considering the possibility that if they did not take action, Frorer Partners could in fact foreclose on the Pet360 shares.  Accordingly, their conduct in this case was not "grossly off-the-mark."  In re Zale Stockholders Litig., 2015 WL 6551418, at *4 (quoting Solash, 1988 WL 3587, at *9).  Their decisions regarding the Pet360 shares were not "outside the bounds of reason," Albert, 2005 WL 2130607, at *4 (citation omitted), especially considering the fact that the value of the Pet360 shares was virtually unknown at the time.

Tellingly, Defendants' decision to pledge and then retitle Covenant's Pet360 common shares as collateral for the Covenant Loan is protected by the business judgment rule. Under Delaware law, the business judgment rule "generally protects the actions of general partners, affording them a presumption that they acted on an informed basis and in the honest belief that they acted in the best interest of the partnership and the limited partners." In re Bos. Celtics Ltd. P'ship S'holders Litig., No. C.A. 16511, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) (footnotes omitted) (citing Dean v. Dick, No. Civ. A. 16566, at *3-5 (Del. Ch. June 10, 1999)); see also Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985) ("The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" (quoting Aronson, 473 A.2d 805, 812 (Del. 1984))).

In applying the business judgment rule, a court "will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" Id. (quoting Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)). Instead, a court "will presume" that partners "take care to be informed in good faith." Crescent/Mach I Partners, L.P. v. Turner, 846 A.2d 963, 984 (Del. Ch. 2000) (citing Aronson, 473 A.2d at 812). If a partner, "acting with due diligence and good faith, pursues a business strategy that [he] believes will increase the corporation's value, but that also involves the incurrence of additional debt, [he] does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the [partner] [is] protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law." Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 205 (Del. Ch. 2006).

The business judgment rule also acts as a procedural guide for litigants. Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001) (citations omitted). "As a procedural guide, the business judgment presumption is a rule of evidence that places the initial burden of proof on the plaintiff." Id. at 90-91 (quoting Cinemara, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1162 (Del. 1995)). To rebut the presumption, the plaintiff must prove that the defendant violated any one of his fiduciary duties, including the duty of care. Id. at 91 (citation omitted). If the plaintiff fails to do so, "the business judgment rule operates to provide substantive protection for . . . the decisions that have been made." Id. (citation omitted).

Knowing now that Covenant's Pet360 common shares were purchased by PetSmart in late September 2014 for approximately $1 each, the Court cannot substitute its own judgment for that of Defendants. Defendants were not the guarantors of Covenant's success. Defendants acted on an informed basis with the honest belief that, considering all of the circumstances, they were acting in Covenant's best interest. That the Pet360 shares turned out to be worth more than what Defendants thought at the time does not show that they breached their duty of care. Their actions are attributable to a rational business purpose and are protected by the business judgment rule. For these reasons, the Court finds that Defendants did not breach their duty of care. And although no contract cause of action was pled by the Trustee, Defendants acted within the authority given to them by Covenant's LPA.[28]

---

[28] Defendants argue that, in filing an adversary proceeding against Frorer regarding the same Pet360 shares and transfers, the Trustee is judicially estopped to deny that the Frorer parties, not Defendants, caused the Pet360 transfers and any resulting damages to Covenant. (Doc. No. 36 at 53.) But because the Court finds that Defendants' transferring Covenant's Pet360 shares did not amount to a breach of the duty of care or any provision of Covenant's LPA, the Court need not address the issue of judicial estoppel.

### E. The Evidence at Trial Did Not Prove that Defendants Obligated Covenant for their Own Personal Debts and thus Defendants Did Not Breach Their Duty of Care or the Contractual Provisions of the LPA

Although the Trustee argues that Defendants breached their fiduciary duties to Covenant by consolidating the three loans made to Fretz, Freeman, and Covenant into one loan and pledging Covenant's Pet360 shares as collateral for them, the evidence at trial failed to prove this occurred. The evidence presented at trial showed that at some point, Defendants signed a Collateral Release to extend the Covenant Partners Loan because the original note for the loan, signed on or about March 8, 2011, had expired. (Doc. No. 15 at 4; Fretz Tr. at 21:4-6, 22:19-23:12 Jan. 22, 2018.) Throughout the trial, Defendants both denied that the Collateral Release the Trustee had submitted in evidence was the version they had signed. (Ex. P-19; Fretz Tr. at 73:24-74:13, Jan. 22, 2018; Freeman Tr. at 221:10-222:16, Jan. 23, 2018.) Moreover, as noted, the Collateral Release in evidence makes no reference to the personal loans that Frorer Partners made to Defendants. (Fretz Tr. at 115:19-123, Jan. 23, 2018.)

Finally, an Assignment dated December 31, 2013, by which Frorer Partners assigned the loans to Frorer individually in exchange for Frorer's payment of $800,000, lists each loan separately and attaches as Exhibits the promissory notes for each loan. (Ex. D-25 at 2-3.) Based on the evidence presented, the Trustee did not prove that Defendants ever consolidated the loans and pledged the assets of Covenant for their own personal debts. Consequently, the Trustee has failed to prove that they breached any fiduciary duty on this basis.

### F. The Evidence at Trial Did Not Prove that Defendants Failed to Properly Account for Various Assets of Covenant in Breach of Their Duty of Care

The Trustee alleges that Defendants breached their fiduciary duties to Covenant by failing to maintain proper records and by failing to properly account for certain of Covenant's assets. (Doc. No. 37 at 32.) The Trustee further alleges that this failure violated § 10.1 of Covenant's

LPA, which provides in relevant part that the "General Partner shall maintain complete and accurate accounts in proper books of all transactions of or on behalf" of Covenant. (Ex. P-39, § 10.1.) Specifically, the Trustee contends that the following assets are missing from Covenant's books and records: "R. Chakejian; 3190 Tremont; J. Irvine; Issimo Suites; Spotlight; Las Brisas; Market Street Advisors; and JASR." (Doc. No. 37 ¶ 115.)

As an initial matter, a review of the Trustee's Complaint in this case reveals that the Trustee did not plead this failure to maintain proper books and records as one of his bases for breach of fiduciary duty. (Ex. P-1 ¶ 173.) Moreover, conduct regarding the maintenance of Covenant's books and records does not appear in the facts alleged in the Complaint. (Id.) In addition, although the Trustee asserts that Defendants' alleged failure to maintain books and records violated Covenant's LPA, the Trustee has not brought any action for breach of contract. For these reasons, any claim for breach of fiduciary duty based on a failure to maintain proper books and records will fail.

The breach of fiduciary duty claim for failure to maintain adequate books and records also fails, however, because the evidence the Trustee put forth at trial did not prove by a preponderance of the evidence that Defendants in fact failed to account for investments. The Trustee failed to put forth sufficient evidence identifying what these investments were or what became of them. In fact, the Trustee gave virtually no insight at all as to the nature of these investments or what was done with them. Finally, at trial, Fretz discussed each of the assets listed above and what occurred regarding that asset. (Fretz Tr. at 162:1-167:2, Jan. 23, 2018.) Based on the evidence admitted at trial, the Trustee failed to prove any breach of fiduciary duty based on missing assets or failure to maintain Covenant's records.

### G. Damages

Because the Court has been unable to find any breach of fiduciary duty by Defendants, the Trustee is not entitled to damages.

## IV. CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Defendants and against the Trustee. An appropriate Order follows.